UNITED STATES v. BARRETT et al.

(Circuit Court, D. South Carolina. December 11, 1894.)

1. CONSPIRACY—SUFFICIENCY OF PROOF.

The offense of conspiracy, under the laws of the United States, is sufficiently proved if the jury is satisfied that two or more of the parties charged entered into an agreement to accomplish a common and unlawful design, which was arrived at by mutual understanding, followed by some act done by any of the parties for the purpose of carrying it into execution, and the joint assent may be proven by direct testimony, or may be inferred from facts which establish, to the satisfaction of the jury, that an unlawful combination had been formed.

2. SAME—USING MAILS TO DEFRAUD.

Under an indictment for conspiracy to defraud by the use of the mails, the defendants cannot be convicted by proof that they, severally, ordered goods by mail, not intending to pay for them, without showing that such orders were given in pursuance of a prearranged plan.

3. CRIMINAL LAW—REASONABLE DOUBT.

If the jury in a criminal case are satisfied that the accused is guilty, they should not refuse to convict because of a remote, far-fetched, or merciful suggestion or conjecture that possibly he may be innocent. The vague uncertainties to which some minds are always, and all minds are sometimes, liable are not within the contemplation of the law when it directs that the accused shall have the benefit of the doubt.

This was an indictment against Charles B. Barrett and others for conspiracy to defraud by the use of the mails. Trial by jury.

Wm. Perry Murphy, U. S. Atty., and Edward W. Hughes and E. O. Woods, Asst. U. S. Attys., for the United States.

Absalom Blythe, William Munro, and John M. Caldwell, for defendants.

BRAWLEY, District Judge (charging jury). This is an indictment for conspiracy under sections 5440 and 5480 of the Revised Statutes of the United States, which will be read to you. A conspiracy is an agreement between two or more persons to do an unlawful act. The unlawful agreement or combination is the gist of the offense, and at common law the offense was complete when the unlawful agree-

ment was entered into, though nothing was done in execution of its purpose, this being one of the few cases in which the law undertook to punish an unexecuted intent; but, inasmuch as there are no common-law offenses against the government of the United States, an act, to be punished in the federal courts, must be declared an offense by statute, and in an indictment for conspiracy here it is necessary to prove that something was done to carry into effect the unlawful agreement. There must be an agreement of two or more wills to carry into execution some unlawful purpose and some act or acts done in pursuance of that agreement. This joint assent of minds may be proved by direct testimony, or may be inferred from facts which establish to the satisfaction of the jury that an unlawful combination had been formed. It is not necessary to prove that all the parties charged met together and came to an explicit and formal agreement, or that they should all agree formally upon the details or plans by which the unlawful combination should be made effective. The offense is sufficiently proved if the jury is satisfied that two or more of the parties charged entered into an agreement to accomplish a common and unlawful design, which was arrived at by mutual understanding, followed by some act done by any of the parties for the purpose of carrying it into execution. It is not necessary that each of the parties should in person commit the unlawful act, if such act is a part of the plan for which the combination is formed; for, the unlawful agreement having been proved, the act of one is considered the act of all. Each may perform separate and distinct acts in forwarding the design, and proof is not required of participation by each in every step by which the unlawful scheme is carried forward. Nor is it necessary that it should be proved that all of the parties originally combined together, or that each was an original contriver of the mischief, or that all were even acquainted with each other. Mere passive knowledge of the fraud or the illegal action of others is not sufficient to show conspiracy. Some active participation is necessary. If it is proved to your satisfaction that there was in the beginning an unlawful agreement to do the act charged between two or more of the parties, and at any period thereafter a new or additional party came into it for the purpose of aiding in the accomplishment of the plan first agreed upon, and does any act in furtherance of the original design, he is from that moment a fellow conspirator, and responsible for all the consequences which flow from such participation. While it is not essential that each conspirator should know the exact part which every other is to perform, you must be satisfied that a party charged with participation in any of the steps taken in furtherance of the original scheme had knowledge that the parties whom he was assisting were engaged in some unlawful design. Such guilty knowledge may be inferred from his conduct, if the acts proved are of a nature to satisfy the jury that the party was conscious of the fact that the parties with whom he associated himself were engaged in wrongdoing.

Having thus endeavored to make plain to you the law as to the offense charged in this indictment, it may be well to say a few words in respect to the evidence necessary to support it. I have already

charged you that it is not necessary in cases of this kind that the government should prove an explicit, formal agreement among the parties, if you are satisfied that there was a mutual understanding among two or more of them; but inasmuch as you have heard the testimony of some of the parties directly concerned in the alleged unlawful combination, and as much has been said by counsel as to the weight you ought to give to the testimony of co-conspirators, I will instruct you on this point. The law makes them competent witnesses, but the jury must in all cases determine their credibility. Naturally such testimony is open to suspicion, and it would not be safe to accept as conclusive the uncorroborated testimony of accomplices in crime. Being competent witnesses, it is your duty to weigh their testimony with great care, test it by all the ordinary rules by which you are accustomed to weigh evidence, with your minds alert to detect a motive which may have prompted it. Consider it in its relation to all the facts proved, and see whether it is corroborated by the testimony of other witnesses and is consistent with probability. If it is supported in material respects, and produces in your mind an absolute conviction of its truth, then you are bound to credit it, or you may accept so much of it as is corroborated and reject the rest. It is difficult to learn the exact truth and the whole truth as to any human transactions, but we must not for that reason relax our efforts for its ascertainment. As it is peculiarly in your province to determine the facts, all that the court can do is to aid you with such light as the experience of mankind has determined to be most efficacious.

Having thus fixed in your minds the principles of the law respecting conspiracies in general, you will now consider most specifically the particular offense with which these parties are charged. The government of the United States has plenary power over the mails and postal service, and by its legislation has attempted to prevent that service, which is intended for the benefit of the people, being used for the purpose of defrauding them. The law, in its efforts to restrict the use of the mails to beneficial purposes, has provided for the punishment of any person who, having devised any scheme to defraud, effects the same by opening correspondences through the post-office establishment. It is for a combination to make such unlawful use of the mails that these parties stand indicted. The government has attempted to prove that the defendants named in this indictment agreed upon a scheme to defraud the parties therein set forth, and used the mails in furtherance of the design. You have heard the testimony, and it is for you to say whether the proof is sufficient to establish the offense charged. This testimony is very voluminous; it is partly oral and partly written. The delivery of it has consumed four days, and the argument of counsel another day, and the court feels that it is a great tax upon your patience to detain you longer with the recital of the facts; but the importance of the case seems to render it necessary that I should sum up the testimony, and I will endeavor to do so as briefly as I can.

The practice in the courts of the United States permits the judge to express an opinion upon the testimony, and, while it is not my

purpose to do so in such a way as to influence your decision, I wish you to understand that, if in the course of my comments upon the facts I should appear to lean to one side or the other, you are not to consider my opinions upon the facts as in any way binding upon you. You are the final judges of the force and effect of the testimony. While you must accept the law from the court, you must decide the facts for yourselves. Upon your consciences and responsibility rests the ultimate decision of every question of fact. The indictment charges, and testimony has been offered to prove, that in the year 1892 the defendants agreed upon a scheme substantially as follows: That they would, by correspondence with business houses in different parts of the country, obtain shipments of various kinds of goods and articles without intending to pay for the same; that upon their arrival at Spartanburg the consignees thereof would execute sham mortgages and bills of sale, so as to protect the same from seizure by the shippers; and that these articles would be sold, and the proceeds divided among the parties to the scheme. It is charged that shortly before the beginning of operations, and in furtherance of the scheme, several new post offices were established; that Owens, one of the parties, secured, through Barrett, the establishment of a post office called "Owens"; that at his suggestion McElrath likewise applied to Barrett for assistance in establishing a post office called "McElrath"; and Wyatt, another of the parties, had a post office called "Wyatt." All of these offices were in the country,—outside of any town or thickly-settled locality. The parties named, or some member of the family and name, was in each case appointed postmaster. Letter heads were printed setting forth in a neat style the name of the post office and postmaster. A stranger receiving a letter written upon such paper would naturally conclude that his correspondent was a person of some consequence, writing from a town named in his honor, and, holding the office of postmaster, he was probably its worthiest citizen. This impression was doubtless enhanced by the fact that many of the letters were written upon a typewriter. Although the towns of Owens, Wyatt, and McElrath do not appear upon the maps, it may well have been assumed that they were the evidences of the growth of the "New South," of which we hear a great deal. The preliminaries having thus been happily arranged, the "business" began,—not in the old-fashioned way, however. None of these men had any capital; all of them were small farmers,—one-horse farmers,—renters. The defendant McElrath testifies that at a conference with his codefendant Barrett at the inception of the scheme, when its beauties were unfolded, the defendant Barrett said that "it would beat knocking clods to death"; "that people up North were rich, and that we needed money at the South." All of them seemed to agree that the great need of the South was "more money." It is but just to say, however, that whatever may have been the original plan there was nothing sectional in its fruition. In the wide sweep of their enterprise they covered the whole country; for them there was no North and no South, and they must be acquitted of any charge of sectionalism. You will not soon forget, and the innkeepers of this

town will gratefully remember, the long procession of .correspondents of these parties who came here to testify. They came from New York and Chicago, from New Jersey and Pennsylvania, from Boston, Baltimore, and Atlanta, from Washington, Richmond, and Savannah, from Charlotte and Augusta, nor was our own state unrepresented in the melancholy throng. Charleston and Greenville and Columbia each had representatives to show that they had not been neglected. As there was no geographical limit to their field of operations, so there was no limitation as to the objects of their concupiscence. While pianos, safes, and typewriters seem to have been the articles most affected, yet there was scarcely any field of human activity that did not furnish some object that was desired. Bicycles, steam engines, writing desks, chairs, fertilizers, lamps, hats and gloves, encyclopaedias, saddles,—all were ordered with equal prodigality. Nothing was paid for. The testimony shows that most of the articles were ordered by Owens, Wyatt, and McElrath; but Tillman, Hannon, Lee, and Hatcher all seem to have caught the infection of ordering things, the two last named to a small extent only. The fact that a great many articles and goods were ordered, and that they were not paid for, is established by such overwhelming testimony that it has not been disputed; but this, of itself, constitutes no crime. In order to convict, you must be satisfied that these things were ordered through the mails in pursuance of a prearranged plan to swindle the parties who forwarded them. You will consider all the circumstances. When a small farmer, living on rented land, orders a $900 Knabe piano and iron safes, you are at liberty to infer that that is a suspicious transaction; but, even if you conclude that he intended to commit a fraud, you cannot convict upon this indictment unless you find that this was done in pursuance of a plan and in combination with one or more other persons. You will now consider the testimony in its relation to each of the parties implicated. The first named is the defendant Barrett. It appears from the testimony that he is a lawyer, and it is obvious that he is a person of more intelligence than any of those who have appeared upon the witness stand. He has testified in his own behalf, and must have impressed you as a man of acute, supple, and resourceful intellect.

The first witness for the government, one Biggs, details a conversation had with Barrett, wherein Barrett proposed that they should go into an operation similar in kind to that which other witnesses have testified was subsequently entered into, and that he was requested to furnish a list of the principal dealers in pianos throughout the country. The witness declined the proposition; nothing came of it, so far as appears; and Biggs passed from the scene. Barrett makes emphatic denial of such conversation. The next witness is McElrath, who has entered a plea of guilty. I have already charged you as to the weight to be given to the testimony of persons occupying that position. He testifies that he lived about three miles from Owens, and at his suggestion, in March, 1892, he came to Barrett to secure his aid in establishing a post office to be called "McElrath"; that Owens first informed him of the scheme proposed.

and that, after meeting Barrett, the latter told him that "this would beat knocking clods to death"; that Barrett proposed the form of a letter head which his codefendant Hannon carried to the printer; that he ordered a safe; that there was an understanding that the safe was not to be paid for; that the safe was to be sold, and the profits of the operation were to be divided between Hannon, Barrett, and himself; that his next venture was the ordering of a set of encyclopaedias, upon which, by Barrett's advice, he executed a sham mortgage to Tinsley; next a piano, ordered through Tillman; then an organ. This testimony, if it is to be believed, establishes an agreement between Barrett, Owens, and McElrath for an unlawful purpose, and is direct proof of the conspiracy charged in the indictment. You must determine whether McElrath has told the truth, and consider how far he is corroborated. Evidence to show close relations between the two is offered in the letter to Mosler, Bahman & Co., signed, "R. J. McElrath," and proved to be in the handwriting of Barrett. Other evidence of a corroborative nature is found in the fact that the oak desk which the witness swears that he assisted Owens to carry to Barrett's office is proved by indisputable evidence to have been found in Barrett's office at a later day. That the witness was engaged in voluminous correspondence is proved by the letters themselves which have been offered in evidence. You will then consider Barrett's explanation of his relations with McElrath as detailed by him on the stand. Scrutinize the motives and interests which would be most likely to effect their credibility, and determine which one is most likely to be telling the truth. In connection with this you will consider the letter to E. M. Andrews, at Charlotte, about the piano to be shipped to McElrath, recommending him as a man of means, with a postscript, proved to be in Barrett's handwriting, referring to freight. [The testimony of each witness was in like manner stated by the judge, and the rebutting testimony given by each of the defendants implicated, and the jury warned that their verdict should depend upon the testimony heard in the courthouse, and not upon statements made in the newspapers or by parties outside. The charge concludes as follows:]

The burden of proof in all criminal cases being upon the government, the presumption of innocence protects the accused until the jury is satisfied beyond a reasonable doubt that he is guilty. You must not convict unless you are convinced, but, if the proof satisfies you that the accused are guilty, you should not refuse to convict because of some remote, far-fetched, or merciful suggestion or conjecture that possibly they may be innocent. Absolute certainty is rarely possible, and those vague uncertainties to which some minds are always, and all minds are sometimes, liable are not within the contemplation of the law when it directs that the accused shall have the benefit of the doubt. It is not every doubt, however slight or however founded, which should prevent a verdict of guilty. It is not the mere possibility of innocence, or vague notions or capricious or captious doubt, that is intended. If the evidence has produced in your minds a moral certainty that the accused or any of them are

guilty you will say so; if there is a rational uncertainty, growing out of the testimony and sustained by it, and producing a reasonable, substantial doubt as to their guilt, you should not convict. Let the record be handed to the jury.