PATNODE, Respondent, vs. WESTENHAVER and others, Appellants.

*April 25—May 13, 1902.*

*Conspiracy: Evidence: Court and jury: Obtaining property by false promise of marriage: Mutual abandonment of engagement: Ratification of fraudulent transaction: Causes of action: Special verdict: Instructions to jury.*

1. An express agreement between the conspirators is not essential to an actionable conspiracy. It is enough if there is a tacit concurrence in mental intent to effect the common purpose.

2. In an action by a widow for damages alleged to have been caused by the formation and execution of a conspiracy to obtain her property through false promises of marriage made by one of the defendants, the evidence, though circumstantial, is *held* sufficient to warrant the submission to the jury of the question of the existence of such conspiracy.

3. Plaintiff had conveyed real estate to one of the defendants, taking his notes for a part of the purchase price, and had then given back to him one of such notes for $1,500. She testified that it was her purpose to give him $1,500, not a specific part of the realty as such, and that to effect such purpose she took from him the note as a security of the value of $1,500, and then delivered it to him as a gift for that amount and in view of her expectation to become his wife, the understanding between the two being that the property was to be enjoyed by them mutually. *Held*, that the credibility of such testimony was for the

jury, although it was not consistent with many things in letters written by her to him while she was infatuated with him and under his influence.

4. The fact that, after the alleged breaking of the engagement of one of the defendants to marry her, plaintiff followed his advice and married another man, and thereafter expressed satisfaction with having gained a protector and a home, does not show an abandonment of the engagement by mutual agreement, there being evidence that plaintiff was so under defendant's influence that in what she did she executed his will, not her own.

5. The bringing of an action by plaintiff against one of the defendants to recover the amount of one of the notes given by him for a part of the purchase price of her real property, did not preclude her from afterwards maintaining this action against all the defendants for damages caused by the execution of the fraudulent conspiracy.

6. In a case where five questions would have covered all the issues of fact, the submission for a special verdict of twenty questions—some referring to matters not in dispute, some to mere evidentiary matters, some mere repetition in whole or in part of others, some containing elements in the alternative so as to confuse the jury and render an affirmative or negative answer inconclusive as to any material point, and some suggesting to the jury prejudicial circumstances of which there was no evidence,—is *held* to have been a material error.

7. It is error in submitting a special verdict to inform the jury how questions must be answered in order to enable plaintiff to recover.

8. *Per* MARSHALL, J., speaking independently. An instruction that if the jury are satisfied that any witness intentionally testified falsely as to any material fact, then, although not bound to disbelieve all his testimony, they are at liberty to do so, excepting in so far as such testimony is corroborated by other credible evidence or by facts and circumstances, is criticised as leaving room for the idea that the testimony of such witness could not be rejected if corroborated. The approved method of stating the rule is: 'If you believe that any witness has testified wilfully false as to any material matter in the case, you may properly, but are not bound to, on that ground alone, reject all of his evidence not corroborated by some other credible evidence.'

APPEAL from a judgment of the circuit court for Kewaunee county: MICHAEL KIRWAN, Circuit Judge. *Reversed.*

Action for damages caused, as alleged, by the formation and execution of a conspiracy to defraud the plaintiff. The substance of the complaint is as follows:

On April 8, 1896, plaintiff owned a certain lot, described, in Kewaunee, Kewaunee county, Wisconsin. She was then and had been for some time prior thereto an unmarried woman over twenty-one years of age. Defendant *Hulbert* at the same time was an unmarried man over twenty-one years of age, and defendants *Westenhaver* were husband and wife, the wife being *Hulbert's* sister. Before the day named defendants agreed between themselves to fraudulently deprive plaintiff of her property or some part of it in this wise: *Hulbert* was to induce plaintiff to convey part or all of her property to him by promising to take her as his wife and inducing her to believe the promise to be made in good faith, in fact having no such purpose, and, if she showed a disposition subsequently to obtain redress, defendants were to intimidate her, by threats of publicly attacking her moral character, not to do so. Pursuant to such agreement *Hulbert* made love to plaintiff, the *Westenhavers* encouraging his suit, resulting in plaintiff's becoming completely infatuated with him and their exchanging mutual promises of marriage. Thereafter all the defendants co-operated in influencing plaintiff to start *Hulbert* in business and to give him some of her property in view of the fact that he was soon to become her husband. The result was that she conveyed to him the real estate mentioned, for an expressed consideration of $3,500, only $300 of which was paid, taking for the balance his unsecured note for $1,500, and a note for $1,700 secured by a mortgage on the property. The deed was duly recorded and she gave *Hulbert* the $1,500 note. Subsequently, in further execution of the conspiracy, plaintiff was induced to turn over to *Hulbert* the $1,700 note and mortgage, it being suggested to her, by him and *Westenhaver,* that it would not look well for the public records to show a

mortgage in her favor on property owned by her prospective husband, and *Hulbert* further suggesting that she ought to take his word for the payment of the money, under the circumstances. Subsequently, in further execution of the conspiracy, *Hulbert* repudiated his promise to marry plaintiff, assigning as a reason therefor that his relatives, particularly the *Westenhavers,* were opposed to the union because of the disparity between their ages, but he refused to give back to plaintiff any part of the property obtained as aforesaid.

At the time of the occurrences mentioned plaintiff was the widow of one Roberts. Subsequently she became the wife of one Patnode, whose name she now bears. After the marriage to Patnode, defendants, in order to prevent her from seeking redress for the wrongs done by them as aforesaid, and as a part of the design formed at the beginning, charged her with being guilty of various offenses and threatened to expose her to public hatred and scorn and to cause her husband to abandon her; and about the same time the *Westenhavers* importuned her to leave her husband and live with them if the latter made any trouble about the property.

The damage claimed is the value of the $1,500 note, with interest thereon from April 8, 1896.

*Hulbert* answered denying all the charges against him of wrong-doing, and alleged that all the transactions between him and the plaintiff in regard to the property were free and voluntary on her part; that he paid plaintiff $300, and that the balance in value of the real estate was voluntarily given to him by plaintiff; that such value was first put in the form of an indebtedness to plaintiff on a $1,500 note and a $1,700 note, by her request, to deceive her relatives as to the nature of the transaction; that it was her intention, when the property was conveyed and the notes were given to her, to turn them over to him after they had served their purpose of deceiving her relatives, and that such plan was carried out. He pleaded in bar of the prosecution of this action the pendency

of an action previously commenced against him by plaintiff
on contract to recover on the $1,700 note, upon the theory
that it was given to him for safe-keeping and not as his own
property.

The controverted issues upon the evidence relate to whether
plaintiff gave her property to *Hulbert* as claimed in his
answer, or he secured it under a promise of marriage pur-
suant to a fraudulent combination between him and his co-
defendants.    The cause was submitted to the jury for a
special verdict, with the following result:

"1. On or about April 1, 1896, did the plaintiff, *Lizzie C.
Patnode* (whose name was then *Lizzie C. Roberts*) and the
defendant, *Harvey L. Hulbert,* each promise and agree to
marry the other?   *A.* Yes.

"2. On or about April 8, 1896, did the plaintiff convey to
said *Hulbert,* free and clear of incumbrances, her real estate
described as the south sixty feet of lots one and two, in block
six, in the city and county of Kewaunee, Wisconsin?   *A.*
(By the court) Yes.

"3. What was the fair and reasonable value of said real
estate on April 8, 1896?   *A.* $3,500.

"4. As the consideration for the conveyance to him of said
real estate, did said *Hulbert,* at the date thereof, pay to
plaintiff $300 and execute and deliver to her his promissory
note to secure payment to her of the further sum of $1,500,
and also his promissory note together with a mortgage of
said real estate to secure the payment to plaintiff of the fur-
ther sum of $1,700 ?   *A.* Yes.

"5. On April 8, 1896, after said note for $1,500 had been
delivered to plaintiff, did she give back and surrender the
same to said *Hulbert,* at his request, and upon the condition
and understanding that he and plaintiff were to become hus-
band and wife?   *A.* Yes.

"6. If your answer to the fifth question be 'No,' then state
whether said $1,500 was given back to said *Hulbert* as a
present or gift to him from plaintiff, without condition or
understanding that they were to become husband and wife?

"7. On or about August 7, 1896, did said *Hulbert* obtain
from plaintiff the return and surrender to him of said note

and mortgage which secured payment of $1,700?   A. (By the court) Yes.

"8. Was the return of said last-mentioned note and mortgage to said *Hulbert* obtained by persuasion addressed by himself and said *Henry Westenhaver* to plaintiff, to the effect that it would not look well for her to hold or to place on record a mortgage against her intended husband; and upon the promise of said *Hulbert* that on plaintiff's demand at any time, he would deliver back to her said mortgage and the note given therewith, or pay to her the money thereby secured?   A. Yes.

"10. Did the plaintiff surrender said last mentioned note and mortgage to said *Hulbert* as a gift or present to him, without being thereunto advised or persuaded by himself and said *Henry Westenhaver,* and without any understanding that said *Hulbert* should marry plaintiff, and without any promise on his part to return to her the note and mortgage or to pay the money thereby secured?   A. No.

"11. Has said *Hulbert* made any payment of money to apply on said $1,500 note, and if so how much has he paid?   A. (By the court) No.

"12. Has said *Hulbert* made any payment of money to apply on said $1,700 note and mortgage, and if so how much has he paid thereon?   A. No.

"13. Before this action was begun, did plaintiff demand of said *Hulbert* the return or payment to her of said $1,500 note, and did he fail or refuse to comply with such demand?   A. Yes.

"14. Before this action was begun, did plaintiff demand of said *Hulbert* the return or payment to her of said $1,700 note and mortgage, and did he fail and refuse to comply with such demand?   A. Yes.

"15. If you find that plaintiff and said *Hulbert* promised to marry each other, did he make such promise in good faith, with the intention to marry plaintiff?   A. No.

"16. If you find that *Hulbert* promised to marry plaintiff and did not intend to marry her, then answer this question: Was his promise to marry plaintiff made by said *Hulbert* with the fraudulent design and purpose on his part of thereby acquiring over her an influence and control by which he could induce her to transfer her property to him, for a nominal or

inadequate consideration, or by way of gift, and thereby to cheat and defraud plaintiff out of her property?  *A.*  Yes.

"17. Did the defendants, *Harvey Hulbert, Henry Westenhaver,* and *Ally Westenhaver,* his wife, fraudulently and unlawfully combine and conspire together to cheat and defraud plaintiff out of her property by a scheme substantially as follows, to wit: that said *Hulbert* should court and make love to plaintiff, and lead her to believe that he was intent on marrying her; that he should become engaged to marry her; that by means of the influence and control which the marriage engagement would enable said *Hulbert* to acquire over plaintiff, he should induce her to transfer her property to him without any, or for an inadequate or nominal, consideration; that he should then break the engagement and refuse to marry plaintiff; and that, if she should then seek to recover back her property, the defendants should charge plaintiff with unchastity and threaten to expose and disgrace her, and thereby frighten and prevent her from making any attempt to regain her property from said *Hulbert?*  *A.*  Yes.

"18. If your answer to the seventeenth question be 'Yes,' then answer this question:

"In carrying out and putting such conspiracy into effect, was plaintiff requested and induced by said *Hulbert,* and prompted, advised, and encouraged by said *Henry Westenhaver* and *Ally Westenhaver,* to become engaged to marry *Hulbert,* and to convey to him said real estate, and to surrender up to him said promissory notes and mortgage, all with the intent and for the purpose, on the part of the defendants, thereby to cheat and defraud the plaintiff out of her property, and especially out of said $1,500 note?  *A.*  Yes.

"19. What was the fair and reasonable value of said $1,500 note, as a security on the day of its date?  *A.*  (By the court) $1,500.

"20. Did the defendants, on April 8, 1896, through and by means of a pre-arranged plan, including professions of love, affection and a promise of marriage, fraudulently and insincerely made by said *Hulbert* to the plaintiff, induce her to give the $1,500 note to him to be destroyed?  *A.*  Yes.

"21. In August, 1896, or at about that time, and after plaintiff had delivered back to *Hulbert* said mortgage and both of said notes, did he inform her at Milwaukee that he would not marry her?  *A.*  Yes."

Such proceedings were thereafter taken that judgment upon the verdict was rendered in favor of plaintiff.

For the appellants there was a brief by *Wigman, Martin & Martin,* and oral argument by *P. H. Martin.*

For the respondent there was a brief by *John Wattawa,* attorney, and *Nash & Nash,* of counsel, and oral argument by *L. J. Nash.*

MARSHALL, J. Counsel for appellants assign six grounds for a reversal of the judgment, each of which has received consideration. We will take them up in the order in which they appear in counsel's printed argument, stating them in the form of propositions the affirmative of which counsel maintain, and discuss such of the claims under each head as appear to have sufficient merit to require it.

1. Did the trial court err in not directing a verdict for defendants as requested ? That is submitted under subheads as follows:

(a) "There is an absolute failure of evidence to establish a conspiracy." The act of combining together, by two or more persons, essential to an actionable conspiracy, is not usually, if at all, established by direct evidence. If that were necessary in order to punish such wrongdoing, judicial remedies to that end would be exceedingly inefficient. There is a high degree of moral turpitude involved in the deliberation and calculation by guilty parties as to purposes and means, characterizing unlawful combinations to injure, which instinctively inspires secrecy. Therefore, existence of the element of combination is, peculiarly, a matter for proof by circumstantial evidence. Such evidence was respondent's sole reliance in this case. Here are the circumstances disclosed, mentioning evidentiary facts as established which direct evidence tends to establish. Obviously we must so view the record in determining whether the court erred in submitting the issues involved to the jury.

*Hulbert* was about twenty-seven and plaintiff thirty-seven years of age at the time of the alleged wrongful acts. He was a man of more than ordinary experience for one of his years. He had been in business in Chicago and several other places. He was accomplished as a pharmacist, a man of pleasing address, inclined to social pleasures, and of conscious ability to gain the confidence of, and exercise mental control over, a woman of plaintiff's temperament. She was a woman of more than ordinary ability in business affairs, but was uneducated. She was of an exceptionally confiding disposition, and readily yielded consent to the suggestions of a person of the opposite sex who stood near her in daily association, and whom she had reason to expect she might gain for a husband. Her desire for the matrimonial state was so abnormal as to exclude from her thoughts all interfering tendencies, inclining her, apparently, without moral or intellectual power of resistance, to sacrifice all her possessions for even the pleasure of indulging in the hope of its attainment. Her temperament and disposition, as stated, was well understood by all the defendants. Though her weakness was obvious to them, and persons circumstanced toward her as they were would ordinarily have made some effort to restrain and advise her, their conduct was to the contrary.

Plaintiff was married quite early in life to Christian Roberts, a druggist who kept a store at Kewaunee, Wisconsin. He owned the lot where the business was carried on. It was his homestead. He and his wife lived over the store till he died in 1891. He left all his property to her. She had lived over the store, in all, some fifteen years, and had aided in carrying on the drug business. Defendant *Henry Westenhaver* purchased the drug business, but not the store building, in 1895, placing *Hulbert* in immediate charge thereof, who, with the aid of plaintiff, conducted the same for several weeks thereafter. At the end of that time the *Westenhavers* moved to Kewaunee and *Henry Westenhaver* took charge of the drug,

business.   It was carried on, thereafter, under his personal
charge, with the aid of *Hulbert* and plaintiff as clerks, till
about August, 1896, *Hulbert* being advertised as his partner.
*Hulbert* was a brother of *Mrs. Westenhaver.*   Soon after he
and plaintiff became associated together in the drug business,
she indicated a high regard for him and he commenced paying
attention to her in a way to give her hope that he had matri-
mony in view.   About January 1, 1896, he made a proposal
of marriage to her, to which she did not respond.   The close
relations between the two were well known to the *Westen-
havers.*   For several months subsequent to the 1st day of
January mentioned, they were very much in each other's
company.   She became blindly attached to him and he led her
to believe that in great measure he reciprocated such attach-
ment.   In March, 1896, she was influenced by her father to
meet one Winkler in Milwaukee, he desiring her to become
Winkler's wife because he was a man of property.   She did
not take kindly to her father's plan in that regard because
the execution thereof might separate her from *Hulbert.*
While on the trip to Milwaukee she wrote letters to *Hulbert*
indicating that she would not marry Winkler unless he,
*Hulbert,* wished her to; that she loved and could love only
him.   She addressed him in the most endearing of terms;
"My dear *Harvie,*" and "My own dear *Harvie,*" being
favorite expressions.   She closed her letters with the same
indications of warm attachment; "Your *Lizzie,*" "Lots of
love and kisses from your *Lizzie,*" being forms of expression
used.   In such letters she said to him that language was not
adequate to express the depths of her love for him; that it
was incomparably more intense than the love she had for her
husband in his lifetime; that she could not live without him;
that if he did not reciprocate her attachment she would turn
over all her possessions to him and bid good-bye to the world
and to life, as there would be to her nothing worth living for;
that if his love for her was as warm as hers for him, they

would never have to part; that when she returned they would
have boundless pleasure in honey and kisses.

She returned to Kewaunee as free as she went away on
the excursion to see Winkler. She was met at the train by
the *Westenhavers* and induced by them to go to their home
to spend the night. They knew of the purpose of her trip
to Milwaukee and of the result of it. All the parties to the
action spent the night after her return at the *Westenhaver*
home. After the *Westenhavers* had retired for the night,
*Hulbert* and plaintiff talked over the Milwaukee excursion.
He expressed pleasure that the trip had turned out a failure,
as he wanted her for his wife. Before they parted for the
night they exchanged pledges to enter the marriage state with
each other. The next day or thereabouts he secured an inter-
view with her, apparently for the purpose of suggesting, as
he in fact did, that she should, in view of their prospective
marriage, give him a share of her property. Soon thereafter
all the parties to the action met at the *Westenhaver* home.
The *Westenhavers* then made known to plaintiff that they
were fully informed of her approaching union with *Hulbert,*
and they suggested that in view thereof she should help him
by transferring to him some of her property. About a week
thereafter he again importuned her to give him part of her
property, suggesting $1,500 as a satisfactory amount. She
assented, with the express understanding that the property
would be enjoyed by the two together as husband and wife.
Some time before the engagement he obtained an option to
purchase the store lot for $3,500, inducing her to give him
such option by saying that he wanted to prevent another per-
son, who desired to obtain the property, from buying it, be-
cause such an event might interfere with the drug-store
business. He agreed in the written option to pay plaintiff
$50 for the privilege to buy, but he in fact did not pay her
anything, though he held the option till the property was con-
veyed to him in April, 1896. About the time the option was

obtained, plaintiff was casually interrogated by *Henry West-* *enhaver* as to her disposition in regard to sharing her property with a husband if she should obtain one, receiving in response expressions to the effect that if she had a husband whom she loved she would be willing to transfer to him all the property she had in the world.

April 8, 1896, *Hulbert* procured the following papers to be prepared for execution: A deed conveying the store lot to him for the expressed consideration of $3,500; a note for $1,700 and a mortgage upon the property to secure the same; a note for $1,500. He took the papers to the drug store, where, in the presence of *Westenhaver,* they were executed and properly delivered, he paying in cash the balance of the consideration for the property required, with his two notes, to make $3,500. After the securities were so executed and delivered, she bestowed upon *Hulbert* the $1,500 note, *West-* *enhaver* expressing his approval thereof and suggesting that she should destroy the note, which she did by tearing it in pieces, which he and *Hulbert* burned.

A few days after the engagement between plaintiff and *Hulbert,* he purchased for her a marriage engagement ring and himself placed the same on her finger. For several months thereafter the relations between the two, to all outside appearances and so far as plaintiff could discover, were in harmony with a consummation of her matrimonial hopes. They spent much of their time in each other's company. August 7, 1896, when plaintiff was preparing to leave Kewaunee for some time and had it in mind to place her mortgage on record, *Hulbert* suggested to her that a public record of the mortgage would not look well, since they were to be man and wife, and that she had better turn the papers over to him; that he was a man of honor and would give her money whenever she wanted it. She complied with his request. She had received, before that, a similar suggestion from *Westenhaver.*

After *Hulbert* obtained possession of the papers he destroyed them.

Shortly thereafter the attitude of all the defendants toward plaintiff changed. The *Westenhavers* ceased to show the customary regard for her, and *Hulbert* made excuses for not making her his wife. He notified her that he could not do so because of objections raised by his relatives. Plaintiff did not give up hope of yet being his wife, though she renewed her negotiations with Winkler with a view to marrying him and was encouraged by *Hulbert* to do so, he cultivating a belief in her mind that in case of such an event he would be a member of the Winkler family as her son, and that if she should not form a union with Winkler he might yet take her for his wife. The idea of marriage between plaintiff and Winkler was finally abandoned. *Hulbert* did not show any disposition thereafter to take plaintiff for his wife, but urged her to marry Patnode, and she took his advice. At this time she had no home and no property to speak of. Up to the time negotiations with Winkler were broken off, she continued to make protestations of love and affection for *Hulbert,* and he continued to receive the same as proper. The *Westenhavers* were fully informed of all this, and gave no indication to plaintiff of disapproval thereof.

Notwithstanding *Hulbert's* repudiation of his engagement to marry plaintiff, and the impossibility of her desire for association with him being satisfied, by reason of her marriage to Patnode, he refused to return to her any part of the property he received from her. After her union with Patnode she called upon him for the $1,700 note or the money it represented. His reply was that he would have to consult *Westenhaver* about it. All parties met at the *Westenhaver* home, on which occasion *Mrs. Westenhaver* approached plaintiff with something like her former show of affection, and pleaded with plaintiff not to make *Hulbert* any trouble about the property matter. At the same time *Westenhaver*

said that plaintiff should not have a dollar of the property to give to Patnode, and if that caused any trouble between her and her husband she could find a home in his family. Both the *Westenhavers* joined in assuring plaintiff of that.

Summarizing somewhat,—while the engagement existed between plaintiff and *Hulbert,* the *Westenhavers* treated her as a prospective relative; thereafter their attitude changed to one of coldness; later, when there was danger of demands being made upon *Hulbert* to restore the property, they held out to her, as an inducement to not make him trouble, that they would befriend her if property matters caused her any trouble with Patnode. In other ways they sought to influence her not to try to obtain restoration of the property. They were fully informed of her infatuation with *Hulbert,* of her disposition to bestow her property upon him, of her expectation that he would make her his wife, of her subsequent expectation that she could enjoy his company as a son while she was the wife of another. During all the time, their attitude toward her was that of approval and suggestion in the line of her desires. It changed only when they were confronted with the danger that *Hulbert* might be disturbed in the enjoyment of the property he obtained of her.

Enough has been said to show the general features of the case, on the subject of whether there was a conspiracy, as the trial court could reasonably have considered the jury might view the evidence. Many of the matters stated appear by the record beyond dispute. There is evidence therein tending to establish the rest. Now if we were called upon, in order to sustain the ruling of the trial court in submitting the cause to the jury on the subject under discussion, to decide that any express agreement between appellants to defraud respondent is indicated with sufficient clearness to any more than arouse a strong suspicion in that regard, something short of evidencing the existence of a corrupt agreement as within reasonable probabilities, it is not clear but that we would

fail. An agreement, expressly entered into, was not neces-
sary. A mere tacit understanding between conspirators to
work to a common purpose is all that is essential to a guilty,
actionable combination. Individual intent by two or more
persons to do an unlawful act or a lawful act by unlawful
means is the first step in that regard. Next follows concur-
rence between such individuals, not concurrence of action,
merely (*U. S. v. Barrett* [C. C.] 65 Fed. 62), but concur-
rence in mental intent to effect the common purpose, each to
aid the others in that regard. Mutuality in the undertaking
may be secured without any express agreement and without a
spoken or written word between the conspirators or a meeting
of the members of the combine, or their, even, all knowing
each other; or the precise thing to be accomplished or plans
for its accomplishment, either in a general way or in detail,
being distinctly stated by any member of the combine to any
other member. If there is a meeting of minds, brought about
in any way, to accomplish the common purpose, the essentials
of a guilty combination are all satisfied. *Spies v. People,*
122 Ill. 1, 12 N. E. 865, 17 N. E. 898; *Gibson v. State,* 89
Ala. 121, 8 South. 98; *U. S. v. Goldberg,* 7 Biss. 175; *People
v. Mather,* 4 Wend. 229; *U. S. v. Babcock,* 3 Dill. 585.
Applying those principles to the facts here we cannot say but
that they indicate a guilty combination to defraud plaintiff
substantially as claimed, within reasonable probabilities.

A different view from the foregoing might be taken from
the evidence. By this we mean that the inferences from the
evidence are not all one way, yet we venture to say that in
the history of jurisprudence persons have been convicted and
executed as being guilty participants in a criminal conspiracy
on weaker evidence. True, assuming that the relations be-
tween respondent and *Hulbert* were what she claims, her
negotiations with Winkler, both before and after her engage-
ment with *Hulbert,* are hard to understand. They indicate
that her mind was unbalanced to the point or beyond that of

irresponsibility, or that she wilfully disregarded the moral requirements of the social state. But the evidence of her complete subjugation to *Hulbert* is too strong to be overcome by her singular conduct as regards Winkler even when aided by her quick union with Patnode after negotiations with Winkler had been abandoned. If respondent testified to the truth as to her relations with *Hulbert,* the conduct of all the defendants as regards the affair with Winkler is only explainable upon the theory that they realized that she was completely under *Hulbert's* influence and thought to cultivate her infatuation for him for some temporary purpose and at the same time to allow full play to her weakness, possibly to encourage it as regards Winkler, as a means of ridding themselves of her when the object of their scheme had been attained. The whole conduct of defendants is so inconsistent with honesty and good morals that it cannot be easily accounted for without an ulterior motive common to all. It is reasonable to conclude that the acquirement of respondent's property was such motive, and that it fully explains all their operations in view of the low plane upon which the undisputed evidence shows they reasoned and acted.

(b) 'The $1,500 note had no value. It was a mere blind to veil the real transaction, which was a gift of the realty to *Hulbert.* Further, if it was ever in the possession of respondent as a thing of value, it was thereafter bestowed upon *Hulbert* as a gift.' Those suggestions of appellant's counsel do not seem to possess sufficient merit to warrant any extended discussion. There is ample evidence that respondent's purpose, when she transferred the real estate to *Hulbert,* was to give him $1,500, not a specific part of the realty as such; that, in order to effect such purpose, she took from him the note, not as a mere valueless piece of paper, but as a security of the value of $1,500, and then delivered the same to him as a gift for that amount, and in view of her expectation to become his wife, the understanding between the two being that the

property was to be enjoyed by them mutually. It is useless to contend there is no evidence of that, since the respondent so testified and her evidence is not, as we have before indicated, so incredible that it can be entirely disregarded. True, it is not consistent with many things said in her letters, but what part to reject and what part to believe under the circumstances was a jury question. The rule that the positive evidence of a witness, when opposed by all reasonable probabilities, is not worthy of belief by court or jury, does not apply to such a situation. The condition of mind in which the respondent was at the time she wrote the letters, as indicated therein, justifies careful search for some explanation of expressions used by her not, at all points, indicated by the literal sense of her language. In their literal sense they are very contradictory. In one respondent wrote as if she had given *Hulbert* but $1,500. In another she wrote about having given the entire property in the store lot and building to him. In another her language indicates that she had given him the $1,700 note, nothing being said about the $1,500 note. All the letters are worded in a vein of insane infatuation with him. It is not unreasonable to regard her evidence, given after she was rescued from his influence, as most likely to indicate the real truth. There is some reason in the idea that she gave her property to him and that he received it under the circumstances testified to by her, but none in the idea that her love for him was of the character which the language of her letters indicates, and that she gave up her property to him only thinking to secure or retain his love as that of a son.

(c) 'The engagement, if there were one, was mutually abandoned.' Counsel contend for that because after respondent claims the engagement was broken, she followed *Hulbert's* advice by marrying Patnode, and expressed satisfaction, under the circumstances, with having thus gained a protector whom she respected and a home which she stood sorely in need of. We are unable to see in that any abandon-

ment of the engagement by mutual agreement. It is entirely consistent with her having been coerced into a position where the marriage with Patnode was, apparently to her, the only way of securing support and a home. It rather indicates mere blind submission to what she could not help; that she was so completely under *Hulbert's* influence as to be a mere victim of his suggestion. It is reasonable to look at the evidence that way. There is strong proof that she was so under his influence that in what she did she executed his will, not her own. When he suggested negotiations with Winkler, her mental balance inclined that way. When he suggested marriage with himself, she was in immediate harmony with that view. When he suggested turning over her property to him, there was the same harmony of minds. When he notified her that he could not keep his engagement with her, she accepted that situation, protesting still the most unspeakable love for him, which condition of her mind was in harmony with his purpose. When it accorded with his plans for her to reopen negotiations with Winkler, she inclined that way. When he advised her to end her troubles by marrying Patnode, she blindly followed that suggestion. In short, her every act, from the time her associations with him commenced till she married Patnode, seems to have been in harmony with his wishes, and without enough mental resistance by her at any point to evidence that she had a will of her own.

(d) At this point counsel reassert that there is no evidence of any conspiracy. That subject has been fully treated in what has already been said.

(e) 'Respondent having sought to recover the amount of the $1,700 note by an action on contract, she ratified the transaction whereby she conveyed her property to *Hulbert,* precluding her from changing her position and maintaining an action sounding in tort for damages for a conspiracy.' In submitting that proposition, counsel seem to have misconceived the nature of this action. The gist thereof is the

damage suffered by a wrong which was distinct from other wrongs which were in a measure incidental thereto. No damages necessarily resulted from the mere sale of the real estate, nor by the delivery to respondent of the $1,700 note and mortgage for safe-keeping. His obligation to pay the debt represented by such securities was not affected by the wrongful destruction of them or by their wrongful retention by him. If in the execution of a fraudulent conspiracy the victim is induced to make several contracts or part with several things of value, it is by no means necessary for him to repudiate all of the incidental transactions in order to save the cause of action for damages against the members of the combine. The cause of action for the conspiracy in such circumstances is a possession by itself, a right to prosecute for the damages caused by the executed fraudulent combination. That cannot be split up. It must be enforced in a single suit. For example, if one is induced by a fraudulent conspiracy to sell two things of value for much less than they are reasonably worth, taking the promise of one member of the combine or all of them to pay the agreed consideration, which promise is thereafter breached, at least two distinct wrongs are involved, and two distinct causes of action accrue. The execution of the fraudulent conspiracy is one of them; the breach of the agreement to pay the stipulated consideration for the property is the other. The former cannot be split up and one action brought to recover the damages suffered as to one piece of property and a separate action brought for damages suffered as to the other. Neither is that action extinguished or waived by a suit upon the promise to pay. An action upon that promise, and one for damages for the loss brought about by the conspiracy—the difference between the sale price of the property and its reasonable value—are consistent with each other. They both ratify the sale. In the situation of the parties here, neither the action to recover for the $1,700 note nor the action for damages suffered by respondent in the loss of the $1,500

note repudiates the sale of the realty. If we look at all the mischief as growing out of a single wrong, still it must be remembered that it is not the prosecution of two causes of action in such circumstances that is prohibited by law, but the splitting up of causes of action and the prosecution of inconsistent causes of action. It often happens that there are two causes of action for the same wrong, each standing for a distinct right. If they are inconsistent only one can be enjoyed. If they are consistent, all may be followed, if identity of parties does not exist, effecting a merger, though one, or either, proceeding to a satisfaction, might furnish complete redress, and at the point of satisfaction would extinguish the other. *Barth v. Loeffelholtz,* 108 Wis. 562, 84 N. W. 846; *Clausen v. Head,* 110 Wis. 405, 85 N. W. 1028. The right to redress for damages caused by a consummated conspiracy is distinct, so to speak, from the right to redress for wrongs caused in the progress of its execution. It may go against all the members of the combine, and there may be incidental transactions causing damage included in the claim against all, from which causes of action may arise against individual members of the combine. The prosecution of all for the conspiracy may proceed concurrently with the prosecution of one or more members of the combine liable for some element of the damage in another form of action, up to the point of satisfaction, at which point the element satisfied drops out, as there can be but one satisfaction for the same element of damage.

Applying what has been said to this cause, in any view we may take of the $1,700 note, the prosecution of the action against *Hulbert* for that did not interfere with the prosecution against all the defendants for damages for the conspiracy. All the defendants might be found guilty in the latter action for damages, including the $1,700 note, and *Hulbert* be found liable in an action on the note, in which case one satisfaction covering such element would eliminate it from both actions.

2. Did the court err in respect to the form and contents of the special verdict? That must be answered in the affirma-

tive.   The manner in which a special verdict should be
framed has been so often, so recently, and so fully stated that
we cannot reasonably expect, by further discussing the sub-
ject, to eradicate the false notions of the statute in respect
thereto evidenced by the verdict in this case.   We will refer
to the significant previous treatments of the matter and sug-
gest, as we have done before, the importance of a careful
study of the same.   *Eberhardt v. Sanger,* 51 Wis. 72, 8 N. W.
111; *Montreal River L. Co. v. Mihills,* 80 Wis. 540, 50 N. W.
507; *Haley v. Jump River L. Co.* 81 Wis. 412, 51 N. W. 321,
956; *Ohlweiler v. Lohmann,* 88 Wis. 75, 59 N. W. 678;
*Farley v. C., M. & St. P. R. Co.* 89 Wis. 206, 61 N. W. 769;
*Klochinski v. Shores L. Co.* 93 Wis. 417, 67 N. W. 934;
*Louis F. Fromer & Co. v. Stanley,* 95 Wis. 56, 69 N. W. 820;
*Baxter v. C. & N. W. R. Co.* 104 Wis. 307, 80 N. W. 644;
*Mauch v. Hartford,* 112 Wis. 40, 87 N. W. 816.   Instead
of submitting to the jury the few questions—each covering
concisely, plainly, and briefly a single fact in issue raised by
the pleadings and controverted on the evidence—necessary
to include all such issues, which, we will say in passing, do
not exceed five, the verdict was made up of twenty questions,
some referring to matters not in dispute, some to mere evi-
dentiary matters, some were mere repetitions in whole or in
part of others, some contained elements in the alternative so
as to confuse the jury and render an affirmative or negative
answer inconclusive as to any material point, and some con-
tained elements suggesting to the jury prejudicial circum-
stances of which there was no evidence.   For the single basic
issue of fact which might have been stated as follows: "Did
defendants confederate together to have *Hulbert* enter into
an agreement with plaintiff to marry her, use his position as
her intended husband to induce her to give him at least part
of her property, and to then abandon her?" the court gave
this to the jury:

   "Did the defendants *Harvey Hulbert, Henry Westenhaver,*
and *Ally Westenhaver,* his wife, fraudulently and unlawfully

combine and conspire together to cheat and defraud plaintiff out of her property by a scheme substantially as follows, to wit: That said *Hulbert* should court and make love to plaintiff and lead her to believe that he was intent on marrying her; that he should become engaged to marry her; that by means of the influence and control which the marriage engagement would enable said *Hulbert* to acquire over plaintiff, he should induce her to transfer her property to him without any, or for an inadequate or nominal, consideration; that he should then break the engagement and refuse to marry plaintiff; and that, if she should then seek to recover back her property, the defendants should charge plaintiff with unchastity and threaten to expose and disgrace her, and thereby frighten and prevent her from making any attempt to regain her property from said *Hulbert?*"

By stating all the details set out in the complaint as to the manner the alleged fraudulent scheme was to be carried out, the court suggested the existence of evidence as to each of them.     There was none whatever respecting any agreement to charge plaintiff with unchastity and to threaten to expose and disgrace her and to thereby prevent her from endeavoring to recover her property from *Hulbert;* yet, by the answer to the question, the jury found that there was.     That indicates, clearly, that they were either misled by the question, or that they were perverse; which of the two we are unable to say.     The conspiracy to rob plaintiff may have been formed and some one of the details alleged to have been agreed upon not have been included in the understanding, and not have been essential to plaintiff's right to recover.     All the alleged details having been made a part of the question, while as to one, a matter of considerable significance bearing on the real point in issue, there was no evidence, it did not admit of a direct answer for or against the appellants.     It admitted only of an answer in their favor.     The answer the other way, as before indicated, showed that the jury did not understand the question at all or that they purposed to find for respondent

regardless of the evidence.    The result is that there is no
reliable finding on the initial question in the case.

Much ground might be covered in analyzing the verdict
question by question and showing the useless and prejudicial
features thereof, but we forego doing that because it has been
covered in principle in the cases cited, particularly in *Mauch
v. Hartford,* 112 Wis. 40, 87 N. W. 816.    The court has often
criticised special verdicts, severely, for faults in matters of
form where no reversible error was found, hoping to secure
a better administration of the special verdict statute.    It is
feared that the frequency with which judgments have been
affirmed notwithstanding defects of form in special verdicts,
it being suggested that trial courts have a wide discretion as
regards the questions to be submitted for such a verdict, has
led to the belief, to some extent at least, that there can be no
prejudicial error in such matters.    If such be the fact, there
can be no better opportunity to correct it than in this case,
with twenty questions for a verdict, consisting of nearly a
thousand words, only five at the most being needed, which
might be clearly expressed in seventy-five to a hundred words.
A special verdict may be framed with so many needless ques-
tions covering undisputed matters and matters of mere evi-
dence, and questions covering the same facts in different
forms, as to obscure the few facts in issue,—turning a statute,
intended to be a valuable aid in arriving at the truth as re-
gards the rights of parties, so as to have the very opposite
effect.    It is considered that we have a striking example of
such contrary effect in this case.    The purpose of a special
verdict is not, as seems to be supposed by some, to enable par-
ties to cross-question the jury and make disclosures as to their
mental operations in reaching conclusions upon the turning
facts in a case, or to test the intelligence of the jury by an
exhibition as to whether they so fully comprehend the case as
to be able to find their way through a labyrinth of questions
by a consistent line. Instead of framing a special verdict so as

to set a trap for the jury or compel them to grope their way
through a mass of useless questions, so far as ultimate facts
are concerned, the study should always be how to state the
ultimate controverted questions of fact—facts necessary,
from the standpoint of good pleading, to make out a cause of
action—so that each proposition may be expressed in as few
words as can practicably be used and yet make the matter clear
to the ordinary lay mind; and how to state the propositions
so that each will be perfect and exclusive, not a restatement
in whole or in part of any other proposition, and so that each
will admit of a direct answer one way or the other.   Where
the statute says, "A special verdict is that by which the jury
find the facts only, leaving the judgment for the court" (sec.
2857, Stats. 1898), the word "facts" means ultimate facts,—
those upon which the case turns as a matter of law.   The
language of sec. 2858, "Such verdict shall be  .  .  .  in
the form of questions, in writing, relating only to material
issues of fact and admitting a direct answer," refers to issues
of fact essential to the cause of action or defense from the
standpoint of good pleading, and expressly prohibits all other
matters.   The aim of the statute is to enable the court to focus
the mental operations of the jury upon the turning points in
a case, avoiding the danger present in taking a general verdict
of the law being applied to facts, in form, without any pre-
cedent finding of facts.   Instead of the benefits of the statutes
being enjoyed by the parties to this litigation, the attention
of the jury being focused upon the few essential disputed
matters, it was directed to a mass of things, so that in the
end there was no such verdict as the law requires.   True, the
court has a wide discretionary power, as has often been said,
in the framing of a special verdict.   That discretion, how-
ever, goes to the manner of submitting questions covering the
issues which the statute requires to be presented by the ver-
dict, not to obscuring them by joining with them a mass of
questions, which the statute expressly prohibits.   A violation

of the statute by including irrelevant matters in the verdict is not necessarily reversible error. It may be deemed harmless under sec. 2829, Stats. 1898. But when such errors go to the extent of denying the privilege of the special verdict statute, they affect, substantial rights and constitute reversible error. It is considered that the verdict in question falls under that condemnation.

3. Did the court err in its instructions to the jury? Counsel for appellants complain of this language used in regard to the question submitted, intended to cover the issue as to the formation of a conspiracy, to which we have referred at some length:

"It is not enough for the plaintiff to show that the conspiracy alleged in her complaint was formed and existed and that in the execution of it she was defrauded out of her property, if that was the fact. . . . The plaintiff cannot succeed in this action unless she proves to your satisfaction by a clear preponderance of the evidence that the $1,500 note was obtained from her by *Hulbert* through a conspiracy and in the execution of it; and unless she makes that proof in that degree you must answer that question 'No;' but if she does, your answer to it should be 'Yes.' "

In that the court seems to have industriously informed the jury not only how to answer the particular question the instruction was directed to, but the one which preceded it, in order to enable the plaintiff to recover. That method of instructing a jury, in taking a special verdict, is so clearly destructive of the rights of parties to the benefits of the special verdict statute, as to have come to be regarded as prejudicial error almost as a matter of course. *New Home S. M. Co. v. Simon,* 104 Wis. 120, 80 N. W. 71; *Sheppard v. Rosenkrans,* 109 Wis. 58, 85 N. W. 199; *Musbach v. Wis. Chair Co.* 108 Wis. 57, 84 N. W. 36.

Some matters are presented by appellants' counsel for consideration, to which we have not referred specially if at all; but since they are either not prejudicial to appellants, or be-

cause of what has been said upon other points they are not liable to occur on another trial, it does not seem that anything further need be said to prevent a recurrence of anything of a prejudicial nature, disclosed by the record, which is complained of.

*By the Court.*—The judgment is reversed and the cause remanded for a new trial.

MARSHALL, J. (speaking independently).    There is one matter presented for consideration in the brief of appellants' counsel, not mentioned in the opinion of the court, which seems to me ought not to be passed over without some expression of judicial views in respect to it, even though they do not go on record with the indorsement of the court.    Want of indorsement does not always mean absence of concurrence in what is said on a subject as much as want of harmony respecting the necessity for treating it.    In this connection we should say, to avoid misapprehension, that the instruction hereafter mentioned is deemed by my brethren to be a reasonably clear statement of the law in language which, in substance, has received the approval of this court. In such a situation, probably silence, as a general thing, is not inconsistent with a full discharge of judicial duty; though it is thought that individual expression of views on such occasions is often beneficial. With this apology, so to speak,—justification, perhaps, is the better term for the occasion,—I will speak briefly of the omitted matter to which I have referred.

Appellants' counsel complain of this instruction given to the jury:

"If you are satisfied that any witness who testified on either side of this case knowingly and intentionally testified falsely in regard to any fact which is material to the case, then although you are not bound to disbelieve all the testimony given by that witness, you are at liberty to do so, excepting in so far as such testimony is corroborated by other credible evidence or by facts and circumstances in proof."

Since there is a judicially approved way of stating the rule—one that has long been used—it is better to adopt it than to invent new modes of expressing the same. The effort before us is not entirely free from fault. There is an unnecessary use of words, and an arrangement thereof which renders the exact meaning obscure even to those trained to understand such matters. It seems that the ordinary juror might very likely gather an idea therefrom inconsistent with the true rule. Probably the learned trial judge had the correct idea in mind, and aimed to state it so that the jury might understand it. It is not improbable that he really intended to greatly improve upon the language usually employed. However, "in testing the accuracy of an instruction, it cannot be approved because in the sense intended it was free from error, if it was liable to be and may probably have been understood in a different sense which was harmful." *F. Dohmen Co. v. Niagara F. Ins. Co.* 96 Wis. 38, 71 N. W. 69. There is room in the court's language for the idea that if a witness wilfully testifies falsely in regard to a material matter in a case where he gives evidence, the jury may reject all of his testimony not corroborated by credible evidence produced or by some fact or circumstance in proof, but not when so corroborated. The correct idea, in the circumstances suggested, is that the evidence can be rejected notwithstanding the corroboration, if overcome by other evidence so as to disprove it in the judgment of the jury, but cannot be rejected on the sole ground that it is wilfully false. Further, as claimed by counsel for appellants, one might gather from the language used the idea that corroborating facts and circumstances are sufficient to prevent the rejection of evidence of a witness on the ground of his having testified wilfully false as to some material matter, if merely testified to or evidenced in some way, though not in a credible way. If this simple method of stating the rule, which, in substance, has been approved by this court from time to time for over forty years, were used

in instructing a jury in regard to the rule of evidence under discussion, any one of them of ordinary understanding would easily grasp the correct idea: 'If you believe that any witness has testified wilfully false as to any material matter in the case, you may properly, but are not bound to, on that ground alone, reject all of his evidence not corroborated by some other credible evidence.' *Mercer v. Wright,* 3 Wis. 645; *Morely v. Dunbar,* 24 Wis. 183; *Bratt v. Swift,* 99 Wis. 579, 75 N. W. 411; *Miller v. State,* 106 Wis. 156, 81 N. W. 1020. This very brief, clear way of stating the rule received approval in *Allen v. Murray,* 87 Wis. 41, 46, 57 N. W. 979, 981. 'If you believe a witness has testified on this trial wilfully false in regard to any matter material to the case, you have a right, if you see fit, to reject all his evidence not corroborated by some credible evidence produced.'