## BURT v. C. GOTZIAN & CO.

### (Circuit Court of Appeals, Eighth Circuit. July 2, 1900.)

### No. 1,349.

1. APPEAL—PLEADING AND PROOF—VARIANCE—HARMLESS ERROR.

Where the ultimate facts which warrant a decree for plaintiff are clearly alleged in the bill, a variance between the evidential facts alleged and those proved, which has not misled or surprised defendant, nor prevented a fair trial of the issue presented by the proofs, is not fatal to the decree, and will not require its reversal.

2. ASSIGNMENT OF ERROR—CONSTRUCTION.

A specification of error that the court erred in admitting any testimony under the bill merely challenges the sufficiency of the facts stated in the bill to constitute a cause of action, and, where the ultimate facts pleaded are proved, it does not reach the objection that there was a variance between the evidential facts charged and those established by the evidence.

3. FRAUDULENT CONVEYANCES—ASSIGNMENT OF SHERIFF'S CERTIFICATE.

A. was the real owner of about 6,000 acres of land and some stock and machinery thereon, which appeared of record in the name of his brother B., but which had been conveyed by the latter to a sham corporation which A. controlled; and the deed and bill of sale were in A.'s possession, but were not recorded. A. then purchased goods of C., a corporation, and of other merchants, whom it represents, in the name of his brother B., and on the credit of his title to this property, with the intent never to pay for them, and caused B. to further cover it up with fraudulent mortgages. Other creditors of B. fastened the lien of their judgment upon these lands before some of the fraudulent deeds and mortgages were recorded, sold the land under an execution on their judgment, and obtained a sheriff's certificate from which the owner of the land could redeem by the payment of about $800, while the title maturing under it was worth more than $30,000. Three days before the expiration of the year of redemption, A., who still controlled and really owned the lands, subject to this sheriff's certificate, purchased the certificate, and caused it to be assigned to D. for the purpose of defrauding C. and the creditors it represents, and then failed to redeem from the sale under it, so that the title vested in D., who knowingly took the assignment and title to aid and abet A. in his scheme to defraud the creditors. C. obtained a judgment against B., and brought this creditors' bill against D. and others to avoid the assignment of the sheriff's certificate, and to subject the lands to the payment of the claims of the creditors. *Held*, that the assignment of the sheriff's certificate was fraudulent and voidable as to C. and the creditors it represents, and their claims are superior in equity to the title of D. thereunder. While it is conceded that the sheriff's certificate was valid, and that if A. had bought it in his own name or in the name of B. for his own benefit, without any intent to defraud the creditors, the title of the assignee would have been invulnerable to their attacks, yet the facts that he purchased it in another's name, for the purpose and with the intent to defraud these creditors, and that the assignee knew this, and took the assignment and the title to aid and abet him in his fraudulent scheme, are fatal to its validity as against the creditors whom they sought to defraud.

4. SAME.

The use of a valid judgment or sheriff's certificate of sale to defraud creditors is as futile as the use of a deed or mortgage for that purpose.

5. CREDITORS' BILL—DECREE.

A decree on a creditors' bill to subject lands, the title to which was in defendant, to the payment of plaintiff's judgment, on the ground that defendant knowingly took the title under an assignment of a sheriff's certificate of sale fraudulent and void as to plaintiff, which merely adjudges such assignment void as to plaintiff, and that the lien of the latter's claim is superior to defendant's title under the assignment, presents no question

of rescission, and is therefore not erroneous on the ground that it rescinds the assignment without requiring a return of its purchase price, or of the moneys subsequently expended in payment of taxes and incumbrances.

6. FRAUDULENT CONVEYANCE—KNOWLEDGE OF GRANTEE.

One who knowingly takes a conveyance to aid and abet a scheme to defraud creditors cannot hold the fraudulent instrument, or any interest thereunder, as against such creditors, to secure the amounts paid therefor, or for the satisfaction of taxes or incumbrances on the property.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the District of North Dakota.

U. M. Rose (W. E. Hemingway and G. B. Rose, on the brief), for appellant.

George S. Grimes (Seth Newman, Burleigh F. Spalding, and Winfield S. Stambaugh, on the brief), for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. The appellee, C. Gotzian & Co., a corporation, was a judgment creditor of Bartholomew Pickert. It brought a creditors' bill against him, the Pickert Land, Grain & Stock-Raising Company, of North Dakota, a corporation, Flora J. Burt, Fannie Snow, and Eldridge Gerry Snow, her husband, and Herbert Ernest Matthew Davies. All the defendants answered except the defendant Davies. A large amount of testimony was taken, the case went to final hearing, and the court made written findings of fact and conclusions of law, and rendered a decree to the effect that a certain deed of lands in North Dakota, dated January 20, 1892, made by Bartholomew Pickert and his wife to the stock-raising company, a certain mortgage of some of those lands for $5,500, made by Bartholomew Pickert and his wife to Fannie Pickert, now Fannie Snow, and an assignment of a sheriff's certificate of sale of all the lands in controversy from George S. Grimes to the appellant, Flora J. Burt, were fraudulent as to the appellee, and that these lands should be sold to satisfy its superior lien. This appeal challenges that portion of the decree which adjudges the assignment of the sheriff's certificate to Flora J. Burt fraudulent, and the assignment of errors which she has filed is limited to the claim that the court erred in its findings of fact that the purchase and assignment of this sheriff's certificate were brought about through the efforts of one R. F. Pickert; that he furnished the purchase money therefor; that in this purchase the appellant acted at his instigation and for his benefit; that the assignment was procured, and the sheriff's deed subsequently issued thereon was obtained, for the purpose and with the intent to thereby place the record title of all the lands in question beyond the reach of the creditors of Bartholomew Pickert; that the appellant took the assignment in her name to aid and abet the Pickerts in this fraudulent scheme; and that the court also erred in its conclusion of law that the assignment was fraudulent and void as to the appellee, and that the title of Flora J. Burt to the real estate was inferior in equity to the lien and claim of C. Gotzian & Co.

The question which this assignment presents is chiefly one of fact,

and that question can only be determined by a careful consideration of the testimony and acts of the parties to the transaction, of their relation to each other, and of the circumstances which surrounded them when the assignment was made. Fortunately that portion of the findings of the chancellor which has not been challenged by the appellant presents with admirable clearness the situation of the parties, and the circumstances surrounding them at the time of the transaction. From that part of the findings we draw these facts: R. F. Pickert was a brother of Bartholomew Pickert, and throughout all the transactions hereafter mentioned he held a power of attorney from his brother Bartholomew, and pretended to act for him as his agent and attorney in fact, but in truth Bartholomew Pickert was the mere tool of R. F. Pickert, and in all he did and said relative to. the property that was in his name or possession, or relative to the debts that were contracted in his name, he was under the control and acted by the direction of R. F. Pickert, and for his benefit. R. F. Pickert was the real owner of all the property which Bartholomew ever appeared to own or possess. On January 20, 1892, Bartholomew Pickert appeared by the record to be the owner of all the lands described in the bill, which comprise about 6,000 acres, situated in Steele county, N. D., and of a stock of machinery, tools, and merchandise thereon, and he had no other property. The lands were worth $35,000, and the stock $6,000. On January 20, 1892, Bartholomew Pickert and his wife made a deed of nine sections of this land, which comprised all of it but one section and a quarter section, to the stock-raising company, and on the same day he made a bill of sale of all his personal property to the same company. This deed and bill of sale were placed in the hands of R. F. Pickert, who kept the possession of them and concealed them from the creditors hereafter mentioned until they were recorded,—the bill of sale on February 12, 1893, and the deed on March 1, 1893. On April 19, 1892, Bartholomew Pickert made a chattel mortgage upon nearly all his stock and machinery to James W. Gillies for $15,500. On April 22, 1892, he made a chattel mortgage for $10,000 upon the balance of his personal property to A. E. Gillies, the wife of James W. Gillies. On May 13, 1892, he and his wife made a mortgage for $25,000 to the same A. E. Gillies upon the real estate covered by their deed to the stock-raising company. On October 10, 1892, they made a mortgage for $5,500 on the section and quarter section of the land described in the bill, which was not covered by the deed to the stock-raising company, to Fannie Pickert, the daughter of R. F. Pickert, who afterwards married Eldridge Gerry Snow and became Fannie Snow. All these mortgages and the deed and the bill of sale of January 20, 1892, were given without any consideration, with the intent on the part of R. F. Pickert and Bartholomew Pickert of covering up the property described therein, of placing it beyond the reach of the creditors, and of defrauding them out of the goods they sold to the Pickerts, and out of the purchase price thereof. R. F. Pickert and Bartholomew Pickert never intended to pay for the goods which they bought of the appellee and the other creditors whom it represents, when they purchased them; and the Pickert Land, Grain &

Stock-Raising Company was organized by them as a corporation under the laws of New Jersey about September, 1892, for the sole purpose of defrauding the creditors by covering up the property that had been in the name of Bartholomew Pickert in the name of this corporation, which never had any other property, never took possession of this property, and which was controlled and managed throughout its brief nominal existence by R. F. Pickert. In order to carry out this nefarious scheme, Bartholomew Pickert on April 21, 1892, after he had placed the deed and bill of sale of January 20, 1892, in concealment, in the possession of R. F. Pickert, made or caused to be made to the R. G. Dun & Co. Mercantile Agency a written statement that he owned the real and personal property heretofore mentioned, and other property, which he stated was all together of the value of $287,900, and that his liabilities were $14,250. Immediately after this statement was received at St. Paul, Minn., R. F. Pickert, acting as the pretended agent of Bartholomew Pickert, but in fact for himself, applied to the appellee and to various other merchants in St. Paul and Minneapolis to purchase goods and merchandise on credit in the name of Bartholomew Pickert. These merchants applied to the R. G. Dun & Co. Mercantile Agency, and obtained the information set forth in the written statement of Bartholomew Pickert, before they sold their goods; and then, in reliance upon this statement, and upon representations made by R. F. Pickert along the same line, they sold goods on credit, nominally to Bartholomew Pickert, at the request of R. F. Pickert. In October, 1892, the purchase price of these goods had not been paid, and R. F. Pickert represented to some of these creditors that Bartholomew Pickert was in embarrassed circumstances, and induced them to extend the time of payment of their claims in consideration that he would turn over some valuable assets to a trustee to secure their payment. In carrying out this proposition a promissory note for $11,203.52, which represented the amount of the claims of 26 of these creditors, was made by Bartholomew, payable on May 1, 1893, to the order of the appellee, C. Gotzian & Co., and some property was turned over to a trustee to secure the payment of this note. The property delivered to the trustee, however, proved to be so heavily incumbered that less than $100 above the expenses of the trust was realized from it. Thereupon C. Gotzian & Co. brought an action and recovered a judgment on October 11, 1898, against Bartholomew Pickert on this promissory note, and the creditors' bill in this suit is founded upon that judgment.

While the transactions we have narrated were going on, the proceedings out of which the relation of the appellant, Flora J. Burt, to this litigation arose, were approaching their consummation. They ran in this way: On September 28, 1892, Allen, Moon & Co. obtained a judgment for $533.40 against Bartholomew Pickert in the district court of Cass county, in the state of North Dakota. On October 1, 1892, they filed a transcript of this judgment in Steele county, in the state of North Dakota, and thereby fastened the lien of their judgment upon the lands described in the bill in this suit. On June 12, 1896, they caused these lands to be sold under an execution issued upon their judgment, and George S. Grimes, their attorney, bid them

in in his own name, but for the benefit of Allen, Moon & Co., for the amount of their judgment, and the sheriff who made the sale issued to him the proper certificate thereof. On June 9, 1897, three days before the year of redemption from this sale expired under the laws of North Dakota, George S. Grimes assigned this sheriff's certificate to the appellant, Flora J. Burt, for the sum of $790.34, and no redemption was made from that sale. At the time this assignment was made, the lands described in the sheriff's certificate were worth $60,000, and the only incumbrance upon them superior to the lien of that certificate was the mortgage for $25,000 to A. E. Gillies, which had been assigned to a bona fide purchaser. The certificate matured into a sheriff's deed, and a complete record title to all the lands in dispute was thereby vested in Flora J. Burt, the appellant.

We are now ready to consider the contention of the appellant that the findings of the court below that R. F. Pickert procured this assignment, and the sheriff's deed which followed it, in the name of Flora J. Burt, in pursuance of his scheme to defraud the creditors whom he had induced to sell goods to Bartholomew Pickert, and for the purpose of concealing the ownership of the lands; that he paid for this assignment; and that the appellant took it, and the sheriff's deed which followed it, at his instigation, for his benefit, and for the purpose of aiding and abetting him in delaying and defrauding the appellee and the other creditors whom it represents,—were erroneous. This contention of the appellant is sustained by her positive testimony that she bought this assignment with her own money, that she did not do so to delay or defraud these creditors, and that since her purchase of it she has expended about $6,000 in paying taxes and incumbrances upon the lands described in it. It is sustained by the testimony of Bartholomew Pickert that he did not furnish the money with which the assignment was purchased, and that it was not bought for him. R. F. Pickert did not testify. On the other hand, the testimony of these witnesses, and of others who acted with or for them, establishes these significant facts: There was a large farm in operation upon these lands, with the necessary stock of machinery and tools to carry it on. The appellant, Flora J. Burt, was not a farmer or a dealer in farm lands. She had never bought or owned any other land. She had never examined and had never seen, to her knowledge, any of the lands described in this sheriff's certificate, or any lands in the county in which these lands were situated, before she took this assignment. She was a young woman, who prior to 1895 had been employed in restaurants and dry-goods stores in the city of St. Paul, where she resided, at rates of wages which she could not remember. In the year 1893 she made the acquaintance of R. F. Pickert, who, with his brother Bartholomew Pickert, had been engaged in selling prize packages of tea, some of which were advertised to contain jewelry. This business was conducted by advertising the sales of these packages in various cities, and carrying on the business in each city in turn until the residents became familiar with its character, and then proceeding to another location. About two years after the appellant made the acquaintance of R. F. Pickert, and in December, 1895, or January, 1896, she entered upon this

business of selling prize packages of tea under the name of the Globe Tea Company. When she commenced this business she employed R. F. Pickert as her advertising agent, made him her attorney in fact, verbally empowered him to act for her in all general matters, including the tea business and the subsequent purchase of the sheriff's certificate of sale of these lands. Later, when he had purchased the assignment of the sheriff's certificate for her, she gave him a written power of attorney to act in her behalf in matters pertaining to this real estate. From the time she embarked in the business of selling prize packages of tea, in 1895 or 1896, until the commencement of this suit, the acts of the appellant and those of her agent and attorney in fact, R. F. Pickert, are almost, if not altogether, indistinguishable. The capital required to operate the tea business was from $350 to $500. She bought her first stock of goods and shipped it to Columbus, in the state of Ohio. R. F. Pickert was her advertising agent, and at the same time was in business for himself. Together they moved the business from city to city and conducted it. In its conduct he sold goods for her, and he sold goods for himself. She testified:

"I used to send his mail, and send his samples and other things. What I did for him offset part of what he did for me. We changed about. Judge Hamilton: You don't mean to say what you did for him offset all he did for you? No; he took it as a part of his salary. He got more than I did out of it."

Together this agent, R. F. Pickert, and his principal, Flora J. Burt, carried on their tea and jewelry business in turn in the cities of Columbus, Toledo, Dayton, Youngstown, Massillon, Steubenville, and Cleveland, in the state of Ohio, between December, 1895, and March, 1899. In the early part of June, 1897, while this close business relation existed between Flora J. Burt and R. F. Pickert, and while she was in the city of Wheeling, in the state of West Virginia, R. F. Pickert appeared in the city of St. Paul, Minn., and went with Mr. James D. Denegre, an attorney at law of that city, to Steele county, in North Dakota. Mr. Denegre testifies that he did not go there to examine, and that he did not examine, the title to any of these lands, but that he went there to examine, and that he did examine, the proceedings which culminated in the sheriff's certificate of sale under the judgment of Allen, Moon & Co. against Bartholomew Pickert, and that he found those proceedings regular. Thereupon he returned to Minneapolis, and bought of Mr. Grimes the sheriff's certificate of sale under that judgment, and took the assignment of it to Flora J. Burt. He paid for it with $40.97 in cash and six drafts which were handed to him by R. F. Pickert. One of these drafts, which was for $250, was payable to the order of R. F. Pickert, and was indorsed by him. The other five were payable to the order of Flora J. Burt, were indorsed by her to R. F. Pickert, and by Pickert to Mr. Denegre, or to his law firm. It was in this way that the appellant bought and paid for this assignment of the sheriff's certificate. She testified that she might have borrowed some of the consideration which she paid for it from R. F. Pickert, but that the drafts and money which Pickert gave for it were hers, and that she bought it for herself, not for any other person, and without any

notice that the purpose of the purchase was to cover up the property in her name, or to defraud the creditors who had sold their goods to Bartholomew Pickert at the request of her agent and attorney in fact, R. F. Pickert. Her testimony is positive, but how can it be credited, in the face of these established facts? She was not a farmer or a dealer in real estate. She knew nothing about this property. She knew nothing about the title to it, and she had no attorney examine its title before she acted. R. F. Pickert was the real owner of it. In three days the title to it was to pass beyond his reach, unless he or the corporation which he controlled redeemed from the sale evidenced by this sheriff's certificate. That title, subject to the incumbrances upon it, was worth more than $30,000, and it required less than $800 to save it. R. F. Pickert knew this. He was the agent and attorney in fact of the appellant. He had unlimited power to act for her in all her business transactions, and their social and business relations were intimate and friendly. Notice to her of facts suggesting inquiry relative to the title of these lands and the claims of these creditors was notice of all the facts which a diligent investigation would disclose. The notice and knowledge of her agent and attorney in fact, R. F. Pickert, constituted notice and knowledge to her: It is incredible that she could have acted and bought this assignment without a reliance upon the knowledge and information of her agent, and, if she acted through him, she was charged under the law with full knowledge of the fraud he was perpetrating, and of the part which this assignment played in its consummation. In this state of facts, the court was unable to believe that a young woman of limited means, who had never bought a foot of land, had invested $790.34 in a sheriff's certificate of sale of lands of which she had no knowledge, without any examination of the lands or of their title, in the absence of some agreement or understanding that the investment should be for the benefit of some one who had more knowledge, and more motive for making it. Nor was it able to believe that the real owner of these lands, who had plotted and schemed for five years to hide them from these creditors and to save them for himself, had suddenly lost his interest, changed his character, procured the assignment of this certificate to an innocent purchaser, and then permitted a title worth $30,000 to slip from his grasp through a failure to pay the paltry sum of $800 to redeem it. A careful reading of the entire testimony has not inspired in our minds a greater faith in the theory of the appellant than that possessed by the chancellor below. Her testimony is evasive, elusive, unsatisfactory, and her memory upon important issues strangely deficient. Many of the letters which she testified she wrote, and many of the acts which she swore she did, proved to be the letters and the acts of R. F. Pickert. The entire record, taken together, has convinced us that he was the player, and she, like his brother Bartholomew, was a mere pawn in the game of fraud and conspiracy he was conducting. Her theory of this case, and of the purpose and effect of the purchase of the certificate, is contrary to the common observation and experience of the motives and acts of mankind, and is too incredible for belief. We are unable to persuade ourselves that she bought and paid $790.34 for an as-

signment of a sheriff's certificate worth $30,000, without any knowledge or examination of the lands it described or the title it conveyed, and without notice of the claims of the creditors which her agent and attorney had been seeking for four years to avoid, and that he abandoned to an innocent purchaser a title worth $30,000, which he controlled, when he knew all the facts, and could have redeemed and saved it for himself with $800. The specifications of error which challenge the findings of fact relative to the claim and title of Flora J. Burt to the lands in controversy cannot be sustained.

Turning from the facts of the case, our attention is challenged to certain questions of law upon which some reliance seems to be placed to obtain a reversal of this decree. It is urged that there is so wide a variance between the pleadings and proof that the decree cannot be sustained. It is said that the bill alleges that the appellant bought the sheriff's certificate with the money of Bartholomew Pickert, and took the title to the lands in her name in trust for him, for the purpose of defrauding these creditors, while the proofs were, and the facts found by the court are, that R. F. Pickert bought it in her name with his money, and she took it and the title to it for his benefit, for the purpose of defrauding the same creditors. It is true that the bill alleged that Bartholomew Pickert owned the land, conceived and executed the scheme to defraud these creditors, and furnished the money to buy the sheriff's certificate in the name of the appellant, and that it contained no allegations regarding R. F. Pickert, or his acts concerning or in relation to the property. It is also true that the proof was that R. F. Pickert was the real owner of the property; that he had pretended to act as the agent and attorney of Bartholomew Pickert and of Flora J. Burt, but that he was in reality himself the principal, while they were his tools; that he had conceived and carried out the scheme to defraud these creditors, from whom he had bought the goods in the name of his brother; that his brother did not furnish the money to purchase the assignment, but that he bought and paid for it, and Flora J. Burt took it, and the title to the lands under it, at his instigation, to defraud the same creditors. The court found the facts which the evidence established, and rendered the decree which those facts demanded. The question is, should this decree be reversed because it was alleged that the chief conspirator was Bartholomew Pickert, while the proof was that the perpetrator of the fraud was R. F. Pickert? It will be noticed that the ultimate fact upon which the decree and the demand for relief in the bill rest was clearly alleged,—the fact that the assignment of the sheriff's certificate and the title to the lands were taken in the name of the appellant, and that she received them for the purpose and with the intent to delay and defraud the creditors whom the appellee represents. It will be noticed that the variance between the bill and the proof is not in the end accomplished, but in the means used to bring about the fraudulent result. The means alleged were the money and the acts of Bartholomew Pickert. The means proved were the money and the acts of R. F. Pickert. Moreover, this proof was presented in the opening of the appellee's case. The appellant was not surprised by it. She was not misled by the pleading in the bill. She

had full opportunity to meet this proof, and she did not neglect her opportunity. After the proofs of the appellee were made, she was sworn, and testified at large twice concerning the charge which these proofs presented. That charge was fairly tried upon the merits, and no exception was taken in the court below to the introduction of any of the evidence which sustains it. The appellee was entitled to the same relief against the appellant if the assignment to her was procured by R. F. Pickert and taken by her to defraud these creditors that it would have been entitled to if the assignment had been procured by Bartholomew Pickert and had been taken by her for this purpose. The material averment of the bill here was not that which named the person who instigated the appellant to take this assignment, but it was the fact that she did take it, at the expense and by the procurement of some wrongdoer, for the purpose of defrauding these creditors. That allegation alone was sufficient to warrant the relief sought and the decree rendered against her, regardless of the identity of the instigator of the fraud. As the bill clearly charges the fraudulent character of the assignment which this appellant took, and since she was not surprised, misled, or deprived of a full opportunity to rebut the evidence relative to the man and means which procured it, but presented her evidence and tried that issue on the merits, without taking any exception to the introduction of the testimony which presented it, there cannot be said to be any such variance between the allegata and probata in this case as will warrant a reversal of the decree. Where the ultimate facts which warrant the decree are clearly alleged in the bill, a variance between the evidential facts alleged and those proved, which has not misled or surprised the appellant, nor prevented a fair trial of the issue presented by the proofs, is not fatal to the decree, and will not require its reversal. Moore v. Crawford, 130 U. S. 112, 142, 9 Sup. Ct. 447, 32 L. Ed. 878; Wallace v. Loomis, 97 U. S. 146, 160, 24 L. Ed. 895. There is another reason why this objection to the decree cannot be sustained. It is that it has not been assigned as error. The only specification which in any way challenges the relevancy of the evidence or the sufficiency of the bill in this case is in these words: "The court erred in admitting any testimony under the complaint in the above-entitled cause." The only effect of this specification is to challenge the sufficiency of the facts stated in the complaint to constitute a cause of action, and there is no ground whatever for that challenge.

Another position of counsel for appellant is that R. F. Pickert had the right to purchase the sheriff's certificate of sale either in his own name, or in the name of Flora J. Burt for his benefit, and that if he did so the assignment was unassailable by the creditors of Bartholomew Pickert. This position would be sound if R. F. Pickert had been a stranger to the property and to the creditors, and if he had purchased the assignment without any intent or purpose to defraud them. But when the facts are that he was the actual owner of the property, which he had kept of record in the name of Bartholomew Pickert until he had purchased the goods on credit in Bartholomew's name; that he controlled the sham corporation in whose name he

placed the title to the lands; that he purchased and placed the assignment of the sheriff's certificate in the name of Flora J. Burt for the purpose of defrauding these creditors,—the transaction takes on a different hue, and the assignment, like every other mortgage and deed of this property which he procured to be made for the purpose of defrauding the creditors, becomes fraudulent as to them, and inferior in equity to the lien of their judgment. Fraud vitiates every transaction, at the suit of the party injured. Equity looks through forms and appearances to the true nature of the act, and seeks to grant appropriate and adequate relief. There is no scheme so deep, no device so cunning, as to be impervious to its remedies. R. F. Pickert bought the goods for whose purchase price the judgment in favor of C. Gotzian & Co. was rendered on the faith of a title to lands which he owned, but which he caused to appear in the name of his brother; and equity will follow those lands through every fraudulent mortgage, deed, bill of sale, assignment, and device which he concocts, and through the names of every agent and tool he employs, until they are subjected to the payment of the claims of the creditors he planned to defraud. His purchase of the sheriff's certificate in the name of the appellant to defraud these creditors was as vulnerable to their attack as was the fraudulent deed and mortgage he caused his brother to make to the sham corporation for the same purpose. Each was a device to place this property beyond the reach of creditors who were entitled to subject it to the payment of their claims. As to them, each was fraudulent, and each conveyed a title inferior in equity to their rights. The use of a valid judgment or sheriff's certificate of sale to defraud creditors is as futile as the use of a deed or a mortgage for that purpose. Decker v. Decker, 108 N. Y. 128, 135, 15 N. E. 307; Stovall v. Bank, 8 Smedes & M. 305, 316; Haas v. Haas, 35 La. Ann. 885.

Finally it is contended that the decree is erroneous because it rescinds the assignment of the sheriff's certificate, without a return of the purchase price paid for it, or of the moneys subsequently expended by the appellant in the payment of taxes and incumbrances upon the property. The contention is based upon a misapprehension of the effect of the decree. It does not rescind the assignment, or leave the title to the lands in the assignor, Grimes. It merely adjudges that as to the appellee the assignment is fraudulent and void, that the lien of its claim is superior to the title of Flora J. Burt under the assignment, and that the lands shall be sold to satisfy that lien. The legal effect of the decree is to leave the title to the lands in the appellant, subject to the lien of the appellee for the amount of its judgment, interest, and costs. The result is that no question of rescission is presented by the record or the decree. This was not a suit for rescission, and no rescission was adjudged. It was a creditors' bill to subject these lands, the title to which is in the appellant, to the payment of the judgment of the appellee, on the ground that she knowingly took the title to them under an assignment which was fraudulent and void as to the appellee and the creditors whom it represents. It does not appear from the findings of the court below, nor is it certain from the evidence, that the appellant ever paid any-

thing on account of this property which she did not receive from R. F. Pickert. The court below found that he paid the purchase price of this assignment, and that finding has been affirmed. The testimony strongly indicates that much, if not all, that she claims to have paid for taxes and incumbrances upon the property was paid or furnished by Pickert. But it is unnecessary to investigate or to consider this question. She knowingly took this assignment to defraud these creditors. If she had paid the purchase price for it, and if she had paid $6,000 on account of taxes and incumbrances upon the lands, she would not be entitled to any allowance for or reimbursement of these sums, as against the creditors represented by the appellee. One who knowingly takes a conveyance or assignment to aid and abet a scheme to defraud creditors cannot hold the fraudulent instrument, or any interest under it, as against the creditors, to secure the amounts paid for it, or for the satisfaction of taxes or incumbrances he has paid upon the property it affects. Sands v. Codwise, 4 Johns. 598; Railroad Co. v. Soutter, 13 Wall. 517, 20 L. Ed. 543; Thompson v. Bickford, 19 Minn. 17 (Gil. 1); Roller Mills v. Ward, 6 N. D. 317, 328, 70 N. W. 271; Davis v. Leopold, 87 N. Y. 620, 622; Swinford v. Rogers, 23 Cal. 234. There was no error in the decree of the court below, and it is affirmed.