In re FRIEDMAN.

(District Court, E. D. Wisconsin. September 11, 1908.)

1. BANKRUPTCY—FRAUD OF BANKRUPT—CONCEALMENT OF INSOLVENCY.

Evidence that a bankrupt merchant, when in fact insolvent, purposely falsified an inventory of his stock, largely increasing the same, and used it as a basis of statements made to commercial agencies and others, that he destroyed books, which made it impossible to ascertain his transactions, and that, having previously established a fictitious credit by borrowing money from relatives with which to discount his bills, he purchased within six months before his bankruptcy a quantity of goods largely in excess of his purchases for the entire preceding year, which goods he did not pay for, and only part of which were accounted for, justify a finding that he deliberately and fraudulently concealed his insolvency for the purpose of obtaining goods on credit which he did not intend to pay for.

2. SAME—CONTEST OF CLAIMS—EVIDENCE.

On a contest of claims filed by certain relatives against the estate of a bankrupt, where it was clearly shown that the bankrupt fraudulently concealed his insolvency for the purpose of securing a large stock of goods on credit without intending to pay for the same, and that the claimants had been closely associated with him in business transactions, evidence was admissible to show that they had previously been associated together in similar fraudulent transactions.

3. EVIDENCE—WEIGHT—DIRECT AND CIRCUMSTANTIAL EVIDENCE.

If the positive evidence of an alleged fact is inherently improbable, the court is not bound to accept it as establishing such fact, but may reach a conclusion based upon circumstantial evidence which appears more convincing.

4. CONSPIRACY—EVIDENCE TO ESTABLISH—"ACTIONABLE COMBINATION."

A mere tacit understanding between conspirators to work to a common purpose is sufficient to constitute a guilty actionable combination.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, §§ 1–5.]

5. BANKRUPTCY — PROVABLE CLAIMS — CONSPIRACY TO DEFRAUD OTHER CREDITORS.

When a creditor of a bankrupt participates in a scheme to defraud other creditors, and in furtherance thereof advances money or incurs expense, the entire transaction is contaminated by the fraud, and the court

will not assist the conspirators by allowing claims for such advances against the estate.

6. SAME.

Where a creditor of a bankrupt makes a claim the larger part of which is fraudulent, he is not entitled to the allowance of any part thereof.

7. SAME.

The brother and brother-in-law of a bankrupt each filed a large claim against his estate for money lent. The bankrupt was conducting a mercantile business, which had been purchased jointly by the three; the bankrupt's interest being paid for with borrowed money. Afterwards the claimants ostensibly sold their respective interests to the bankrupt, taking his notes, which were, however, ignored thereafter until his bankruptcy. Claimants thereafter made many loans to the bankrupt to enable him to discount his bills, in many cases themselves borrowing the money. By means of such discounts the bankrupt built up a fictitious credit, and on his bankruptcy was indebted in the sum of $56,000, and the claimants indirectly purchased his stock for $23,000 and placed the bankrupt in charge as manager. *Held*, that such evidence was sufficient to establish a conspiracy between the three to enable the bankrupt to defraud his creditors, if not in fact a joint ownership of the business, which required a disallowance of the claims.

In Bankruptcy. On review of order of referee allowing certain claims.

This is a proceeding to review the order of the referee, who has allowed certain claims of the bankrupt, as follows: Sam. J. Weinberg, $512.37; Tillie Friedman, $7,782.09; Hattie Saxe, $430; Louis Friedman, $4,941.42; E. M. Rieselbach, $11,550.91. The dramatis personæ are as follows: Adolph Friedman, a dealer in clothing, the bankrupt; Louis and Sol. Friedman, brothers of Adolph; Tillie Friedman, the wife of Adolph; E. M. Rieselbach, a brother-in-law; Philip Saxe, a merchant of considerable means. Adolph Friedman, Louis Friedman, and E. M. Rieselbach each married a sister of Leo and Philip Saxe. Hattie Saxe is a sister of Philip and Leo Saxe, and was from time to time employed as bookkeeper by the bankrupt. Morris, Jacob, Louis, and Henry Friedman, connected with the Friedman Mercantile Company of St. Louis, are cousins of the bankrupt.

The trustee filed objections to these claims, in substance as follows: First, generally, that such amounts are not due and owing from the estate; second, that each of these creditors has, within the four-months period, received a payment from the bankrupt which amounted to a preference, and therefore ought not to participate without first paying back the several amounts so received; third, "that at the time the indebtedness claimed to exist by said claimants was alleged to have been incurred the said claimants and the bankrupts were, and for a long time prior thereto had been, unlawfully confederated together, with the false and fraudulent purpose of defrauding the creditors of said bankrupt, and the moneys so alleged to have been advanced and loaned by said claimants to the said bankrupt were then and there so advanced and loaned in pursuance to said unlawful confederation, and for the sole purpose of aiding and abetting the said bankrupt in the fraudulent design to defraud his creditors by creating for said bankrupt a false and fictitious credit, standing, or rating, by means of which the said bankrupt would be enabled to secure a large stock of merchandise upon credit without intending to pay therefor."

The evidence shows that in 1890 Adolph and Louis Friedman and E. M. Rieselbach were each carrying on a clothing business in Kentucky. At one time Louis and Adolph were partners at Philpot, Ky. Louis sold his interest in the store to Rieselbach. In 1889 Adolph purchased Rieselbach's interest for $12,000, and paid $2,100 on account. Rieselbach went to St. Louis. Adolph came to Milwaukee in 1902, leaving his store at Yelvington, Ky., to be run by

an employé. Louis bought the Westphal stock at Milwaukee for $9,000. Louis claims to have advanced $6,000 of this and Adolph $3,000, which sum was furnished him by his wife. Louis also claims that after remaining in partnership with Adolph for about three weeks he sold his interest to Adolph. About this time Rieselbach advanced $3,000 to Louis and took his note for that amount, which note seems to have been ignored by both parties. Louis took Adolph's note for $2,775, ostensibly for the balance of his purchase of Louis' interest in the Westphal stock. The trustee claims that Louis, Adolph, and Rieselbach were jointly interested in the venture, and the notes given by Louis and Adolph were intended to conceal the participation of Louis and Rieselbach, and to give Adolph the status of sole trader. Adolph then owed Rieselbach $3,000 on the purchase price of the Yelvington stock. He also claims to have owed his wife the further sum of $2,300, advanced long before that time, and $3,950 for a later advance by her. So that Adolph appears to have been insolvent at the time of the Westphal purchase. In 1902 the entire stock at Yelvington was destroyed by fire, and netted by way of insurance $8,000, with which sum Adolph paid up Rieselbach his debt of $3,000 and also paid other debts. In 1903 Louis set up in business on his own account in Milwaukee. In August, 1905, Adolph moved to the store on Twelfth and Walnut streets.

On August 15, 1905, Adolph took an inventory (which was the last inventory he ever took), which showed stock on hand, $16,888.65. This inventory was doctored and padded by the bookkeeper, so that the stock on hand was raised $11,298.60, so that the bogus inventory showed, August 20th, stock on hand, $28,187.25. There has been introduced in evidence an itemized statement, showing in detail how this fraud was practiced, nearly every item in the inventory being arbitrarily raised; and this fraudulent inventory became the basis of financial statements made by Adolph to banks and commercial agencies. August 21, 1905, the bankrupt made a statement to the First National Bank, in which he listed his merchandise on hand at $17,000. His liabilities he scheduled: Bills payable for merchandise, $300; open accounts, none; loans or deposits, none. By this statement the bankrupt's net worth was $18,000. On the 25th of October, 1905, the bankrupt made another statement to the First National Bank of Milwaukee, wherein he listed his merchandise on hand as $26,240.50, and liabilities: Merchandise accounts, $8,265.73; loans or deposits, none; other indebtedness, none—total liabilities, $8,265.73, making his net worth $19,164.77. On the 10th of January, 1907, the bankrupt gave a statement to the First National Bank of Milwaukee for the purpose of procuring credit from time to time, in which he stated that his merchandise on hand was worth $47,465; bills payable for merchandise, $2,700; due First National Bank, $3,500; other bills payable, $4,000; open accounts not due, $4,900; due relatives and employés, nothing. This statement remained unchanged until his failure, at which time he owed the First National Bank $2,000. Other similar statements were given out to the Dun and Bradstreet agencies.

It further appears that about July, 1907, the cash book, which would have disclosed the dealings with relatives, was destroyed, and the bookkeeper made up what she called a copy of the missing book; but it was not a copy. It was apparently made up for the purpose of confusing the true situation. Later an itemized expense book disappeared, which had been kept in the store, and which would have thrown light on the situation. To show the utter worthlessness of the cash book: The expert accountant when on the stand tabulated the monthly balances of cash for 2 years, as shown by the bank account, the account kept on the stubs of check book, and the cash book. For 12 months the cash book balance, which should show total cash in bank and in store, showed a much smaller amount than was shown in the bank account alone. The account in the check book only agreed with the bank balance in a few instances, and generally they were wide apart.

Louis Friedman and E. M. Rieselbach loaned the bankrupt large sums of money to enable him to discount his bills. The volume and frequency of such loans may be shown by the following statement:

| | |
|---|---:|
| 1905. | |
| April 8.............................................................. | $ 100 00 |
| September 1 (note)............................................. | 1,500 00 |
| 1906. | |
| January 5 (borrowed from Marshall & Ilsley Bank)............ | 1,188 00 |
| February 2........................................................ | 50 00 |
| ”     21....................................................... | 250 00 |
| April 9............................................................ | 100 00 |
| June 6............................................................. | 100 00 |
| ”   14............................................................ | 200 00 |
| August 11......................................................... | 150 00 |
| September 1....................................................... | 300 00 |
| October 11........................................................ | 1,000 00 |
| November 12 (Marshall & Ilsley Bank, Louis and Rieselbach) | 5,000 00 |
| ”      12........................................................ | 5,000 00 |
| December 10....................................................... | 200 00 |
| ”     15 (currency)......................................... | 300 00 |
| May 5............................................................. | 500 00 |
| 1907. | |
| January 11......................................................... | 500 00 |
| ”     15......................................................... | 2,500 00 |
| ”     25......................................................... | 300 00 |
| ”     28......................................................... | 500 00 |
| March 12 (note discounted Marshall & Ilsley Bank by Louis and Rieselbach) | 1,000 00 |
| May 2............................................................. | 1,000 00 |
| June 1............................................................. | 1,000 00 |
| ”   6............................................................. | 200 00 |
| ”  15........................................................... | 300 00 |
| ”  21........................................................... | 300 00 |
| July 6............................................................. | 500 00 |
| ”  6 (note paid Friedman Mercantile Company)............... | 1,000 00 |
| ”  31............................................................ | 500 00 |
| August 5.......................................................... | 1,000 00 |
| ”   6............................................................. | 125 00 |
| ”   20............................................................ | 200 00 |
| ”   31............................................................ | 96 04 |
| September 5 (paid Friedman Mercantile Company)............... | 2,000 00 |
| ”     11............................................................ | 200 00 |
| ”     20............................................................ | 909 00 |

Some of these advances were repaid by check by the bankrupt from time to time. Rieselbach and Louis Friedman, both being in business on their own account, were heavy borrowers at the Marshall & Ilsley Bank. They resorted to various expedients to raise this money for Adolph. Life insurance policies were hypothecated. Money was raised by their joint indorsement at the bank, and $2,500 was advanced by Philip Saxe, for which Rieselbach and wife gave a mortgage on their homestead. At the same time the Friedman Mercantile Company was induced, by indorsements of Louis and Rieselbach, to advance $4,000. Wolf Friedman, a cousin in New York, contributed $1,000. Sol. Friedman contributed $1,000. The bankrupt himself put up his insurance policies, and resorted to the desperate recourse of reshipping goods of his creditors in the original packages to relatives, who would take them, at cost, so as to raise ready money. By these and other methods the family resources were exhausted. Adolph was able to discount his bills, and in consequence obtained credit. The best houses were eager to sell him their goods, and other concerns followed their example. He was able to procure, and did procure during the last six months of his career, about $69,000 worth of merchandise. The expert bookkeepers testify that according to the books there should have been in the store at the time of the failure $81,000 worth of stock, whereas the stock actually inventoried, at cost prices, $32,597.67.

The involuntary petition was filed on the 25th of September, 1907, whereby it appeared that the bankrupt owed on merchandise account $65,868.35 and

had no assets except his stock. During the four-months period the bankrupt distributed among his relative creditors $7,673 in cash. Upon the appointment of a receiver an emergency order was made by the court for the speedy sale of the stock of goods. The highest bid for the stock was made by Philip Saxe, and the stock was struck off to him for $23,400. Thereupon Louis and Rieselbach entered into a written contract to reimburse Saxe for any losses he might incur in connection with this purchase, and Tillie Friedman hypothecated her interest in the Saxe estate. The bankrupt was reinstated as manager, and the new business is conducted in the name of E. M. Rieselbach & Co., who, by the written memorandum, are to be the owners of the business as soon as all liability of Philip Saxe has been discharged.

The referee admitted under objection testimony tending to show that these claimants were concerned in helping Leo Saxe to conceal assets when he failed some 10 years since, and that goods were shipped by Leo Saxe to Louis Friedman at St. Louis in original packages on the eve of his failure, and that Louis made him a loan thereon, and that Rieselbach, being then in St. Louis, acted for Louis Friedman in carrying out the fraudulent scheme, and also testimony of the same general nature as to the participation of Rieselbach in another alleged fraudulent scheme of the same nature.

Bloodgood, Kemper & Bloodgood, for trustee.
Harry M. Silber, for claimants.

QUARLES, District Judge (after stating the facts as above). Concerning the claim of Tillie Friedman, the wife of the bankrupt, there is evidence tending to cast suspicion upon its genuineness; but as the referee, who heard the testimony, has allowed it, I do not find sufficient evidence to warrant a reversal of his conclusion. It is claimed, however, that as within the four-months period she received in cash from the bankrupt the sum of $700, with sufficient knowledge that it was intended as a preference, she ought to be compelled to return such sum to the trustee as a condition to the allowance of her claim. She swears expressly that she had no knowledge of her husband's business, or of his financial condition. It may be said to be quite probable that she did have knowledge; but the burden is upon the trustee to show that she had reasonable cause to believe that the amount paid to her was intended as a preference within the meaning of the bankruptcy act. In re Pfaffinger (D. C.) 154 Fed. 523. The evidence is in my judgment insufficient to overcome her positive testimony on the subject. Therefore, as to the claim of Tillie Friedman, the finding of the referee will be affirmed.

For the same reasons the conclusion of the referee as to the claim of Sam Weinberg will be affirmed.

The case of Hattie Saxe stands on a different footing. She was for a time, in 1905 and 1907, acting as bookkeeper for the bankrupt. She admits that she knew what the books showed as to the liabilities and financial condition of the bankrupt. She was concerned in the preparation of the bogus inventory of August 20, 1905, and must have been aware that it was intended for a fraudulent purpose. The "itemized expense book" of the bankrupt disappeared while she was in charge of the books in 1907. Without reviewing the testimony in detail, I find that she had reasonable cause to believe that the payment to her of $600 on her claim shortly before the failure was intended as a preference. She drew her own check for $600, and got

it signed, presumably because she knew what was about to happen. I therefore reverse the finding of the referee as to this claim, and hold that Hattie Saxe should not be permitted to participate in the distribution of the estate until and unless she first pays to the trustee the sum of $600 received by her as a preferential payment within four months of the bankruptcy.

I cannot affirm the conclusion of the referee as to the claims of Louis Friedman and E. M. Rieselbach. The theory of the trustee is that the stock of goods bought by Louis Friedman of Westphal for $9,000 was in truth and in fact a joint purchase by Adolph, Louis, and Rieselbach; that each contributed $3,000 toward the purchase price; that Louis remained an ostensible partner with Adolph for two weeks, and then pretended to sell out his one-third to Adolph, and took a note for $2,775 from Adolph, due in two years; that at the same time Rieselbach advanced $3,000 to Louis as his share, but to conceal the real transaction took back a note from Louis for the $3,000; that the conspiracy was then entered into to conceal the connection of Louis and Rieselbach in the business, but to hold out Adolph as the sole owner of the stock of goods, and, further, to secretly advance the necessary means to Adolph to build him up and to conceal his insolvency, and thus to enable him to secure a fictitious rating in the trade; to conceal the fact that they were advancing means to him, but to take notes for the amounts so advanced for their protection when necessary; that the scheme was by such false pretenses to enable him to secure a large stock of goods on credit without any purpose to pay for the same, to use the bankruptcy court as an agency to wreck the concern, and then to come forward and bid in the stock at the bankrupt sale at the lowest price and start the business again with a handsome margin of profit.

Counsel for claimants practically demurs to the evidence, and asserts that, if all these supposed facts were true, the conclusion drawn by the trustee is unsound. Counsel's contention is rested on a line of authorities of which Field v. Siegel, 99 Wis. 605, 75 N. W. 397, 47 L. R. A. 433, is a leading case. This line of authority is not applicable to the instant case. This is no common-law action, brought by a general creditor for damages resulting from a conspiracy to conceal the debtor's goods and prevent a recovery. This is a proceeding in a court exercising equity jurisdiction, brought to recover money advanced to the bankrupt and alleged to have been used to perpetrate a fraud and induce dealers to part with their goods when there was no purpose to pay for the same. In Field v. Siegel a conspiracy is set out which is not actionable. The court is at pains to say that there the purchase was made when the vendee was solvent, and to differentiate the case from the line of authorities which must govern here. The principle of law which must rule this case is laid down by the Supreme Court in Donaldson v. Farwell, 93 U. S. 631, 633, 23 L. Ed. 993:

"The doctrine is now established by a preponderance of authority that a party not intending to pay, who, as in this instance, induces the owner to sell him goods on credit by fraudulently concealing his insolvency and his intent not to pay for them, is guilty of a fraud which entitles the vendor, if

no innocent third party has acquired an interest in them, to disaffirm the contract and recover the goods."

The same doctrine is held by the Supreme Court of Wisconsin in Lee v. Simmons, 65 Wis. 523, 27 N. W. 174:

"Where, as here, a person orders goods, knowing himself to be insolvent, without disclosing his insolvency, and with the preconceived purpose of not paying for them at all, or, at most, only a very small per cent., and with the further preconceived purpose of having them swell his assets for the benefit of those whom he intends to make his preferred creditors, the purchase is fraudulent."

Many of the cases cited by claimants' attorney are discussed in the opinion. See, also, Consolidated Mining Co. v. Fogo, 104 Wis. 97, 80 N. W. 103.

It is a familiar principle that when one takes an assignment or mortgage of a debtor's property, and leaves the same in the debtor's possession as the ostensible owner, and conceals such transfer or mortgage, he is guilty of a fraud as to any subsequent creditor who deals with the debtor on the strength of such assets. Our recording acts are predicated on this principle. On the hypothesis of the trustee the claimants not only concealed their loans to the bankrupt, but their joint ownership in the bankrupt's goods, and allowed Adolph to appear as the sole proprietor, doing business with his own means. This was an effectual means of concealing his insolvency. It is true, as claimed by counsel, that the purchaser of goods may remain silent as to his financial condition and commit no fraud by failing to disclose his insolvency. Adler v. Thorp, 102 Wis. 70, 78 N. W. 184. But it is otherwise when he takes measures to conceal his insolvency to secure goods on credit.

Let us now proceed to the facts.

First. Did the bankrupt, Adolph Friedman, deliberately set out to conceal his insolvency, and to obtain goods from wholesale houses without intending to pay for the same?

Second. Did Louis Friedman and E. M. Rieselbach, knowing of such unlawful purpose, fraudulently confederate and conspire with the bankrupt to effectuate such scheme?

The evidence conclusively establishes the first proposition, and leaves no doubt in my mind of the corrupt and fraudulent intent of the bankrupt. That he was practically insolvent in August, 1905, there can be no doubt. The methods employed to conceal insolvency were as follows:

The inventory taken August 15, 1905, showed a stock of goods of $18,085.88, according to the footing of the bookkeeper; but by a revised footing the total is $16,888.65. When upon the stand the bankrupt testified that much of this stock was 15 or 20 years old, and was not worth to exceed 50 per cent. of the inventory price. Thereupon, instead of making a reduction for shopworn goods, this inventory was deliberately and ingeniously padded and raised from $16,888.65 to $28,187.25, under date of August 20th. The bankrupt adopted this fraudulent inventory as the basis of statements to banks and mercantile agencies, which went out to the trade. The bankrupt admits upon the stand that these statements were false. In none of them was the

indebtedness to the relatives scheduled, and in one of them it was expressly stated that no liability existed in favor of his relatives or employés. This is a species of fraud severely denounced by the bankruptcy act and made a criminal offense by the statutes of Wisconsin. Furthermore, the book which would have shown more of the details of the business than any other, was purposely destroyed in July, 1907, and an alleged copy of the book substituted, which was in fact a clumsy fabrication, made to facilitate the fraudulent purpose. To show the worthlessness of this book, we find entries like this, "Borrowed $7,500," without indicating from whom borrowed, or what became of the money; and upon the stand the bankrupt, with all the books before him, was unable to tell from whom he borrowed either or any of these sums, aggregating over $43,000. Frequent interlineations, forced balances, and erasures occur which would of themselves render the book practically worthless.

To further discredit the bankrupt's good faith it appeared in evidence that many of the sales made at wholesale to peddlers and others were not entered in any book, and never passed through the hands of the cashier, but the proceeds of such sales were pocketed by the bankrupt. It further appears that shortly before the failure six cases of goods were shipped by the bankrupt to the Friedman Mercantile Company, of St. Louis, in the original packages of the consignors, for which that company were to pay the bankrupt the cost price in cash, to furnish him ready money. It further appears that similar shipments were made to the claimants, Rieselbach and Louis Friedman, to an amount which cannot now be ascertained. As bearing upon the extent of this back-door trade, the expert accountants testified that according to the books there should have been on hand at the time of the failure goods to the amount of $81,000, whereas in truth and in fact such goods inventoried at cost price about $38,000. The bankrupt can make no explanation of this deficit of over $40,-000, and the books throw no light upon the subject. The books do not show the advances made and money loaned by the several relatives of the bankrupt which are the subjects of these claims. Again, the fraudulent purpose of the bankrupt is disclosed by the fact that shortly before the failure, and when he was owing over $56,000 to merchandise creditors, he distributed $7,600 in cash among his relatives.

In a general way the theory of the trustee is strengthened by the reckless manner in which the bankrupt conducted his business. He took no inventory after August, 1905. He had no system, and practically no books of any value, and admits upon the stand that he had no idea at any time as to how he stood. The statement of the bankrupt on the stand is illuminating:

"The way I kept the books I don't think anybody can make head or tail of them."

From the testimony of experts the books would seem to indicate that the expense of the business reached the enormous proportions of 60 per cent. of the gross sales. The bankrupt was able during the last 6 months of his business to gather in fresh merchandise to the

amount of $69,000, which was about $19,000 more than the purchases of the entire preceding 12 months. It further appears from the testimony of the expert bookkeepers that of the borrowed money shown by the books over $16,000 never reached the bank or the business, and the bankrupt is unable to give any explanation of the fact. Upon such a showing the court cannot hesitate to find that the bankrupt was concealing his insolvency, so that he might obtain a large amount of goods, for which he never intended to pay.

Second. The next proposition in order is whether the claimants, Louis Friedman and E. M. Rieselbach, were aware of the fraudulent purpose of the bankrupt, and, if so, whether they confederated with him to assist in carrying it out. Bitter complaint is made that the referee erred in admitting evidence of the participation of these claimants in similar fraudulent transactions several years ago, as tending to show the intimate association of the parties, and as bearing on the question of motive. The following authorities seem to support the ruling of the referee: Cook v. Moore, 11 Cush. (Mass.) 213; Butler v. Watkins, 13 Wall. 456, 467, 20 L. Ed. 629; Holmes v. Goldsmith, 147 U. S. 150, 164, 13 Sup. Ct. 288, 37 L. Ed. 118; Williamson v. United States, 207 U. S. 425, 451, 28 Sup. Ct. 163, 52 L. Ed. 278.

There is strong support in the evidence for the theory of the trustee that the claimants were equally interested with Adolph in the original purchase and were equal proprietors in the business throughout. The note of $2,775, which the bankrupt gave Louis for his one-third interest, was forgotten. It remained in Louis' safe, and he swears:

"I forgot all about this note, and never thought of it until just before the failure."

If the note was purely fictitious, the testimony might be true. If it actually represented $2,775, the story is highly improbable. No indorsement was made upon this note, although he had received many payments from Adolph sufficient in amount to extinguish it. No interest upon it was ever demanded or paid. About the time of this purchase Rieselbach advanced $3,000 to Louis, and Louis gave him a note for that amount. This note was ignored by both parties in the same way. Checks were passed back and forth between the parties, but no indorsements were made. This note was never a factor in their mutual deals or settlements. The readiness of the claimants to respond when the business needed money, the desperate efforts they made to keep it afloat, the enormous sums that they put into it, are consistent with the theory of the trustee and incomprehensible on any other hypothesis.

Louis Friedman and E. M. Rieselbach testified unequivocally that they had no knowledge of the financial condition of the bankrupt at any time. The bankrupt corroborated them in this regard, and there was slight positive evidence to the contrary. Counsel therefore argues that the court must, as matter of law, find their contention established. But such is not the law. If the positive evidence is inherently improbable, the court may reach a conclusion based upon the circumstantial evidence in the case which proves more convincing. Quock

Ting, 140 U. S. 417, 11 Sup. Ct. 733, 851, 35 L. Ed. 501. It may be remarked in passing that Mr. Landauer, a reputable wholesale merchant, testified that Rieselbach urged him to sell the bankrupt a $700 bill by the assurance that he (Rieselbach) knew all about the bankrupt's business; that he was all right, and was honest, etc. This was denied by Rieselbach, but seems entirely credible.

While considering the complicity of these claimants, we must bear in mind the familiar principle of the law of conspiracy that, when satisfactory evidence tending to show confederation has been received, then all the disconnected acts and declarations of either of the conspirators, contributing to the common result, will bind each of the members of the conspiracy alike. Upon this principle, if the evidence shows co-operation of these claimants with the bankrupt to conceal the true condition of the business and the insolvency of the bankrupt, then these claimants would be equally bound by the fraudulent statements and practices of the bankrupt. Confederation is not to be inferred from the mere fact of the relationship of the parties; but, as the Court of Appeals of New York hold in White v. Benjamin, 150 N. Y. 258, 44 N. E. 956:

"Courts scrutinize with the utmost care business transactions between husband and wife, alleged to be fraudulent as against creditors, because fraud is so easily practiced and concealed under cover of the marriage relation," etc.

See Hoxie v. Price, 31 Wis. 82; Blieler v. Moore, 88 Wis. 438, 60 N. W. 792.

Books are intended to show a correct history of all business transactions. A dishonest set of books is the surest earmark of fraud, while the destruction or mutilation of books of account amounts practically to a confession. Not only were two of the bankrupt's books destroyed, but those that remained were made to conceal the debts to the family aggregating nearly $30,000. The books of claimants were produced, and were equally defective and unsatisfactory. There are numerous checks from the bankrupt to Rieselbach, amounting to $2,600, that were not the subject of entry anywhere. The checks of the bankrupt to Louis, produced by the trustee, would more than balance all loans made by Louis that found their way into the bank account of the bankrupt. Yet the books on both sides omit all reference to such checks. The stubs in Rieselbach's check books covering the critical period were unfortunately destroyed, which would have thrown light upon his participation in the purchase of the original stock of goods. The volume of business thus concealed, and the number of transactions thus hidden by concerted action, leave little doubt that the parties were pursuing a common purpose. In contemplation of law this amounts to confederation. A mere tacit understanding between conspirators to work to a common purpose is all that is essential to constitute a guilty actionable combination. Patnode v. Westenhaver, 114 Wis. 460, 90 N. W. 467.

The inference of fraud is strengthened by systematic evasion and contradictory statements of these parties on the witness stand. Louis Friedman and E. M. Rieselbach were both shrewd men, with long experience in this same line of business, and not unfamiliar with the

shifts and devices employed to defraud creditors. They had been intimately associated with the bankrupt for many years. They knew his habits and methods. They knew that when he came to Milwaukee he had nothing, but was doing business on borrowed capital. They were both engaged in business on their own account in Milwaukee, and during the time covered by this inquiry were doing business largely on borrowed capital. It is inconceivable that, with such means of knowledge at hand, they could have been ignorant of the plans and purposes of their relative Adolph Friedman. They knew he was in financial stress. They knew that in January, 1907, the banks had declined to give him greater credit, and one bank had called upon him to reduce his line. They were demanding no security. They were practically taking the risk of the business. To proceed without investigating the soundness of that business would amount to imbecility. They were practically financing the business, and Adolph Friedman was a mere figurehead therein. It was not a case where the money was advanced from an abundant surplus; but these large sums of money had to be borrowed, to be loaned again to the bankrupt, and it was procured with great difficulty. Insurance policies were hypothecated, and in one instance Rieselbach gave a mortgage on his homestead to Philip Saxe for $2,500, to be loaned to the bankrupt. Rieselbach and Louis Friedman indorsed paper for $4,000 to the Friedman Mercantile Company, and for other large sums to Marshall & Ilsley Bank, for the same purpose. The ostensible basis for these large advances were brotherly love—an unselfish desire to help the bankrupt to discount his bills. We are asked to believe that Rieselbach mortgaged his home for $2,500, paying Philip Saxe 5½ per cent. interest, to enable Adolph to save a discount of 6 per cent. for cash. This overtaxes our credulity. It is apparent that this pretext of brotherly affection was a mere subterfuge. The conclusion is irresistible that these large sums of money, raised with such difficulty, were intended to give the bankrupt a fictitious rating in commercial circles. It was to conceal his true condition, and hold him out to the public as possessed of such means that he was able to discount his bills. The manifest purpose was to enable the bankrupt to gather in a large amount of new goods, for which they knew he never intended to pay, and which would eventually fall to them as spoils. It is the general understanding in commercial circles that a trader who discounts his bills is a good risk, and first-class houses are eager to sell him goods without further assurance; and that is what happened here. Goods flowed in copiously, and the wreck was brought about by the false lights set out by the claimants. It matters not whether insolvency is concealed by means of a statement or a stratagem. It is enough that the true facts were concealed from creditors and that these two relatives knowingly participated in the scheme.

When the goods were offered for sale by the receiver, Philip Saxe, a brother-in-law of Adolph Friedman, and a man of considerable wealth, was the highest bidder. He obtained the stock of goods inventoried at cost price at $32,599.67 for $23,400. The evidence discloses, however, that the purchase was made in the interest of the bankrupt and these claimants. Philip Saxe, while upon the witness

stand, reluctantly produced an agreement in writing whereby Riesel-bach, Louis Friedman, and Tillie Friedman indemnified Saxe against loss by reason of his connection with this purchase, and whereby the business is to belong to Louis and Rieselbach after Saxe's note is paid. While the proceeds of the new business were to be deposited in the bank to the credit of "Philip Saxe, Special," the business was to be conducted in the name of E. M. Rieselbach & Co. and Louis Friedman admits that he is the company. The time had come to throw off the mask and assert ownership. The bankrupt was installed as manager. Rieselbach and Louis Friedman are really financing the new busi-ness, as they did before, and Adolph Friedman presides over a fine new stock of goods, inventoried at $32,597.67.

Claimants' attorney has no apology to offer for Adolph Friedman's tricky methods. He protests with great vigor that his clients were ignorant of the true condition of things, and were as much surprised and as basely deceived as the other creditors. The persuasiveness of this contention is lost when his clients promptly condone Adolph's crooked transgressions and place him in charge of the new business. Even the bookkeeper, who, to baffle the creditors, destroyed the cash book, is rewarded by a reappointment. This sudden rehabilitation of Adolph by his outraged relatives is a phenomenon. We read that Lazarus was resuscitated in a miraculous way, but that was accom-plished by divine intervention. Somebody has profited by this tre-mendous leak, whereby nearly $40,000 worth of goods were passed out at wholesale through the back door. The evidence does not show, but it is not difficult to conceive, who reaped the illicit harvest. This may account for the freedom with which these claimants indorsed the bankrupt's paper, whenever needed, and the nonchalance manifested by Rieselbach when he pays off the notes upon which he and Louis were joint indorsers without asking for any contribution from Louis.

It is impossible, within the scope of an opinion, to refer to all the circumstantial evidence in this voluminous record that has been woven into a chain which is strong enough to induce the court to discredit the testimony of the bankrupt and the two claimants as to their knowl-edge of and participation in the fraudulent plan. In the case of Mud-sill Min. Co. v. Watrous, 61 Fed. 163, 9 C. C. A. 415, the Court of Appeals of the Sixth Circuit applied to such an investigation as this the test that science uses to ascertain the truth:

"The hypothesis gains in probability by simplicity and harmony or identity with other probable or certain presuppositions. Subject to the conditions thus stated, the hypothesis has been of great value in the extraction of scientific truth, and, says Mr. Wharton in his very scientific work on Evidence, 'is of no less value in the extraction of juridical truth.' That author vindicates in the most satisfactory way the use of the hypothesis, and sums up his conclu-sion by saying that: 'Juridical conviction may be, therefore, defined to be the fitting of facts to hypothesis. If, in criminal issues, there is reasonable doubt whether the facts fit the hypothesis of guilt, then there must be an ac-quittal. In civil issues, when there are conflicting hypotheses, the judgment must be that for which there is a preponderance of proof.'"

After a most patient investigation, I find that the hypothesis of the trustee reconciles all facts and circumstances of the case. They assemble like the wheels and springs of a watch. Every circumstance

fits into place consistently with known facts and with the motives that actuate mankind, so that any other theory is practically excluded.

It is urged, however, with great confidence that, inasmuch as the evidence shows that the several sums of money represented by the notes were in fact advanced to the bankrupt, therefore these claims must be allowed. It would be a new doctrine, indeed, if a court of equity were called upon to hand back conspirators money which they have embarked in a fraudulent scheme and by means of which the fraudulent purpose has been effectuated. It has been repeatedly held that, where a fraudulent conveyance is set aside by a court of equity, no accounting is to be taken of the money which the fraudulent grantee has actually invested to secure the fraudulent conveyance. This contention of claimants is disposed of by the following authorities: Ferguson v. Hillman, 55 Wis. 181, 190, 12 N. W. 389, is a leading case, where a large number of authorities to the same effect are collated and cited in the opinion. This doctrine was adhered to in Bank of Commerce v. Fowler, 93 Wis. 241, 245, 67 N. W. 423. See, also, In re Flick (D. C.) 105 Fed. 503, Burt v. Gotzian, 102 Fed. 937, 43 C. C. A. 59, and Lynch v. Burt, 132 Fed. 417, 67 C. C. A. 305, both of which were decisions of the Circuit Court of Appeals of the Eighth circuit. The theory of these cases is that when a creditor participates in a scheme to defraud other creditors, and in furtherance thereof advances money or incurs expense, the entire transaction is contaminated by the fraud, and a court of equity will not practically pay a bonus upon the fraud by returning such advance or expense.

It may be claimed that the note of Louis for $2,775 antedates the conspiracy, and on that account ought to be allowed. No one can tell exactly when this conspiracy was entered into. There are certainly several suspicious circumstances connected with the sale by Louis to Adolph of his share of the Westphal stock, out of which this note originated. It is highly probable that this note was fictitious, to be used or concealed according to circumstances. At all events, sufficient money has been paid by the bankrupt to Louis from time to time to discharge this debt. Louis claims to have forgotten about this note, which was in his safe, and he did not remember it until the time when it might be serviceable; and therefore failed to indorse upon it several sums paid by Adolph. No specific application having been made by either party, the court is at liberty to apply such payments upon this claim, which is the oldest in point of time, which payments would extinguish it. But the rule seems to be that where a creditor has interposed a claim, the larger portion of which is fraudulent, he is not entitled to any recovery, because the fraud permeates the entire account. Levy v. Hamilton, 68 App. Div. 277, 74 N. Y. Supp. 159; Byrnes v. Vols, 53 Minn. 110, 54 N. W. 942; Fairfield v. Baldwin, 12 Pick. (Mass.) 388. This last case was cited with approval in Sommermeyer v. Schwartz, 89 Wis. 66, 71, 61 N. W. 311.

For these reasons I am constrained to reverse the finding of the referee as to the claims of Louis Friedman and E. M. Rieselbach, and direct the referee to disallow each of said claims.

The record will be returned to the referee for further proceedings in accordance with this opinion.